**UNITED STATES of America,
Appellee,**

v.

**Fareed N. KIAMIE and Kiamie Manufacturing Co., Inc., Defendants-Appellants.**

**UNITED STATES of America,
Appellee,**

v.

**Fareed N. KIAMIE and Kiamie Fabrics Co., Inc., Defendants-Appellants.**

Nos. 383, 384, Dockets 24279, 24280.

United States Court of Appeals
Second Circuit.

Argued June 11, 1958.

Decided Sept. 3, 1958.

See, also, 18 F.R.D. 421.

Davis, Polk, Wardwell, Sunderland & Kiendl, New York City (Theodore Kiendl, William R. Meagher, New York City, of counsel), New York City, for defendants-appellants.

Paul W. Williams, U. S. Atty., Southern District of New York, New York City (John C. Lankenau, Robert Kirtland, Asst. U. S. Attys., New York City, of counsel), for appellee.

Before HINCKS and WATERMAN, Circuit Judges, and RYAN, District Judge.

WATERMAN, Circuit Judge.

The appellants, Fareed N. Kiamie, Kiamie Manufacturing Co., Inc., and Kiamie Fabrics Co., Inc., were convicted after a nine-week jury trial upon two indictments charging them with corporate income tax evasion in violation of § 145(b) of the Internal Revenue Code of 1939, 26 U.S.C. § 145(b). The first indictment contained one count charging that Kiamie Manufacturing Co., Inc. and Kiamie, as president, filed a false return understating the corporation's income and tax for its fiscal year ending January 31, 1946. The second indictment, containing three counts, charged that Kiamie Fabrics Co., Inc. and Kiamie, as president, filed false returns understating that corporation's income and taxes for each of its three fiscal years ending April 30, 1945, 1946 and 1947. Kiamie was sentenced to imprisonment for four years on each of the four counts, the prison sentences to run concurrently, and a total fine of $80,000 was imposed by levying $10,000 upon each defendant on each count.

Appellants contend (1) that they were deprived of their constitutional right to be informed of the charges against them and were required to carry the burden of proof by a radical change in the Government's theory of the case which was permitted by the trial court in the midst of the trial; (2) that the evidence under any theory was insufficient to warrant the jury's verdict finding them guilty of wilful evasion of corporate income taxes; (3) that the trial court committed reversible error in rulings on evidence; and (4) that the conduct of the prosecutor was improper and so prejudicial as to require reversal. Although these issues arise in a factual setting of unusual complexity, we do not think they are of great difficulty. For the reasons hereinafter stated, we hold that appellants' contentions are without substantial merit and that their convictions must be affirmed.

### 1. Alleged Change of Theory by the Prosecution

The indictments charged generally that appellants had violated 26 U.S.C. § 145(b) by wilfully understating corporate income and income taxes for specified fiscal years. Bills of particulars narrowed the charge by stating that appellants had evaded corporate income taxes by wilfully failing to report specified corporate sales in their income tax returns for those fiscal years. The proceeds of these unreported sales, each of which was set forth in the bills by name and address of customer and by invoice amount, were claimed to be net taxable income. Appellants contend that the Government, with the approval of the trial court, departed in mid-trial from this theory of guilt, a theory resting on proof of unreported sales, and made an entirely novel charge that appellants evaded income taxes by applying an improper and dishonest gross profit percent-

age to the sales that were reported in the tax returns of the defendant corporations for the indictment years. This change in the theory of guilt, appellants contend, was a fatal variance depriving them of their constitutional right to be informed of the charges against them and, in addition, operated to shift the burden of proof from the Government to them.

Evaluation of this contention requires a fuller statement of the positions taken by the parties at various times. From the outset the Government's position was that appellants had wilfully evaded corporate income taxes by concealing unrecorded sales of merchandise. This charge was made known to appellants as early as 1947 and was detailed in the bills of particulars filed in 1951. The Government's case in chief sought to establish this charge by evidence proving that sales had been made which had not been recorded on the corporate books or reported on the tax returns of the defendant corporations, and that these omissions were wilful.

Appellants' position before and during the trial was more complicated. The existence of unrecorded sales was concealed until discovered in 1947 by a revenue agent during an investigation of Kiamie and his corporations. When the first evidence of unrecorded sales was found, Kiamie falsely told his accountant Gellin, who previously did not know of their existence, that the amount was "very, very little." When Gellin found that over $25,000 of unrecorded sales checks had been cashed at the Manufacturers Trust Company, Kiamie stated: "It can't be. It must be a mistake." Later, after the revenue agent had confronted Kiamie's representatives, Lothstein and Gellin, with the secret accounts and unrecorded sales, Lothstein immediately called Kiamie to tell him that the Treasury agents "know everything." Only then did Kiamie admit he had made unrecorded sales and had opened secret bank accounts through Lothstein.

Kiamie then claimed that the unrecorded sales were used to create a cash fund from which black market purchases of goods, similarly unrecorded, had been made. In July 1948 a schedule of alleged cash payments to some twenty-nine vendors (Exhibit MQ), totaling $1,405,-157.05 was delivered to the investigating agents as Kiamie's explanation for the unrecorded sales. At the same time a schedule of unrecorded sales (Exhibit 229) totaling $1,323,334.42 was made available to them.

If no further claims had been made, this would have been a relatively simple case. The Government would have attempted to prove wilful concealment of unrecorded sales and appellants would have attempted to prove that the unrecorded sales were matched by a similar amount of unrecorded black market purchases. However, the entire complexion of the case was radically changed in late 1950 when Kiamie for the first time advanced the claim that the unrecorded sales had in fact been recorded, albeit in an unorthodox fashion.

This new defense was that various intercorporate transactions entered on the books of the Kiamie corporations reflected the unrecorded sales. Thus, while it was claimed that unrecorded sales of merchandise had been made to create a cash fund for black market purchases, it was also claimed that fictitious sales in approximately the same total amounts were entered on the corporate books as having occurred among the various Kiamie enterprises. Appellants contended that these fictitious "intercorporate sales," as they are called, were reported on the income tax returns of the defendant corporations in substitution for the unrecorded actual sales, with the result that the Government received all the taxes due it. Indeed, if appellants' assertions were believed, these procedures resulted in a substantial overpayment of tax.

The intercorporate sale defense went through a considerable evolution. When first advanced by Kiamie in late 1950 to his accountant Solomon and a revenue agent, Kiamie's explanation was that the intercorporate sales matched the unre-

corded sales "dollar for dollar and sale for sale." When Solomon analyzed the intercorporate sales, however, he found that they did not match the unrecorded sales in this fashion. In fact, not even one of the thousands of unrecorded sales was matched by an intercorporate sale of an identical amount. When Kiamie was informed of this, he advanced a new explanation, stating that the intercorporate sales were entered from tape totals of the unrecorded sales. Solomon then made another analysis and found that the total unrecorded sales likewise differed substantially from the total of intercorporate sales.

In September 1951 Kiamie hired Batzer, an experienced accountant who had had no previous connection with Kiamie's enterprises, to attempt a further analysis of the intercorporate sales. By excluding certain of the intercorporate sales and varying the period of analysis Batzer was able to state that the overall totals—not totals month by month or year by year, but the overall totals for the entire three-year period involved in the indictments—of unrecorded sales and intercorporate sales were both in the vicinity of $1,400,000. It was this explanation that appellants advanced at the trial.

It is at this point that the issue of the use and validity of a "gross profit percentage," the issue which appellants claim the Government injected into the case in mid-trial, is encountered. The defense, it will be remembered, claimed that the intercorporate sales of the Kiamie corporations provided a substitute record for the unrecorded sales. For every intercorporate sale, however, there would be of course a corresponding intercorporate purchase. Under orthodox accounting techniques intercorporate transactions could not result in additional overall income being reported, since the amount added to gross sales of one corporation would be offset by an identical amount added to the cost of goods sold of another corporation. To escape this dilemma, appellants contended that the defendant corporations did not obtain the gross profit figure used on their tax returns by subtracting their cost of goods sold from their gross sales. Instead, they claimed that their gross profit—and hence their income tax—had not been understated because their gross profit had been determined by multiplying their gross sales (recorded sales to customers plus intercorporate sales in substitution for unrecorded sales) by a gross profit percentage figure arrived at from experience. This method of reporting income, known as the gross profit percentage method, would reflect the intercorporate sales without offsetting amounts for the corresponding purchases since it disregards cost of goods sold.

The trial court took the position that the validity of the intercorporate sales defense depended upon proof that the corporations utilized an honest gross profit percentage figure in reporting their income. Accordingly, appellants were not allowed to introduce extensive evidence relating to the intercorporate sales until they had first made an offer of proof with respect to the use of a gross profit percentage figure. Apparently it is this ruling which appellants contend was a radical shift in the theory of the case and operated to shift the burden of proof.

We think it clear that the trial court's action was not erroneous. From the outset of the trial appellants had contended that their tax returns were computed by means of the gross profit percentage method. Defense counsel in his opening statement declared that defendants' proof would show that the inventory figures on their returns had been determined by the use of a gross profit percentage based on "their experience." Early in the trial defense counsel questioned Government witnesses as to the use of the gross profit percentage method by the defendant corporations, the percentages used, and comparable percentages in the industry. And appellants, as part of their intercorporate sales defense, gave considerable attention to the use and accuracy of gross profit percentage figures.

Thus the record reveals that it was not the Government or the trial court which introduced the gross profit percentage figure into the trial. Appellants have only themselves to thank for its presence. Nor were appellants surprised by any ruling of the trial court. It is significant that during the course of the trial no claim of surprise was ever made. Cf. United States v. Klein, 2 Cir., 1957, 247 F.2d 908, 916–917, certiorari denied 1958, 355 U.S. 924, 78 S. Ct. 365, 2 L.Ed.2d 354.

Furthermore, we think under the circumstances that the trial court correctly ruled that the use and validity of the gross profit percentage figure was an essential element of the intercorporate sales defense. The trial was a long and complicated one, lasting about nine weeks. Both sides, particularly the defense, sought to go into time-consuming collateral matters that had little bearing on the central issues. It was not error for the trial court to condition the admissibility of extensive evidence relating to the intercorporate transactions upon an offer of proof by the defense concerning gross profit percentages. Appellants were contending that their gross profit was not understated because the concealed sales were reflected in their gross sales figure. But the validity of this defense depended upon proof that an honest gross profit percentage figure had been used in computing the reported gross profit made upon these gross sales. Surely if appellants had not used the gross profit percentage method at all, or had used a figure picked at random, the entire defense would fall. Proof that returns were made out by use of an honest gross profit percentage figure calculated in good faith was central to appellants' defense. Requiring appellants to prove an essential element of their defense did not confront them with a new charge or shift the burden of proof.

### 2. Sufficiency of the Evidence

Appellants argue that the Government's evidence was insufficient to support the jury's verdict and that their evidence in defense was so overwhelming that the trial court should have granted their motion to set the verdict aside. Our review of the record has convinced us that the evidence was such as to place the case within the province of the jury. It is unnecessary to recite the evidence in great detail. We will merely summarize the Government's evidence, which the verdict establishes the jury believed, that appellants wilfully evaded corporate income taxes by concealing unrecorded sales of merchandise; and indicate the circumstances which we think made it possible for the jury to disbelieve appellants' defense.

In 1934 the individual defendant, Fareed N. Kiamie, formed one of the defendant corporations, Kiamie Manufacturing Co., Inc. (Kiamie Mfg.). This corporation manufactured and sold ladies' wearing apparel, principally lingerie. Kiamie was its president and sole stockholder. From 1934 until 1943 Kiamie Mfg. was the only corporation owned and operated by Kiamie.

In 1943 Kiamie formed six more corporations—the other corporate defendant, Kiamie Fabrics Co., Inc. (Kiamie Fabrics); Lerena Lingerie Mfg. Co., Inc., (Lerena); Princess Raja Mfg. Co., Inc. (Princess Raja); Princess Helena Mfg. Co., Inc.; Rosamonde Lingerie Mfg. Co., Inc.; and Kiamie International Ltd., Inc. Kiamie owned all the stock and was president of each. In 1944 two of these corporations, Lerena and Princess Raja, disappeared except as trade names when Kiamie merged Lerena with Kiamie Mfg. and Princess Raja with Kiamie Fabrics.

All of these corporations were engaged in the same business. In fact they seem to be little more than separate trade names under which Kiamie manufactured and sold lingerie. The corporations occupied the same premises, shared a common inventory, and were served by the same employees. But since a consolidated corporate income tax return was not filed, each of the corporations was a separate tax entity. Kiamie managed the affairs of all the corpora-

tions and was responsible for the filing of their income tax returns.

In June 1944 Kiamie Mfg. and Kiamie Fabrics began making sales which were not recorded on the regular books of the corporations. The total amount of these unrecorded sales, which continued until August 1946, was about $1,100,000, and the amount coming within the fiscal years specified in the indictments was about $650,000. Also, unrecorded sales in the amount of some $350,000 additional were made during the same period by the non-defendant corporations.

These sales were concealed in three ways: (1) use of special invoice books; (2) false voiding of sales invoices; and (3) use of false return memoranda. In addition, one sale was unrecorded because the office copy of the sales invoice was torn from the invoice book. Most of the unrecorded sales of the defendant corporations were concealed from entry on the regular corporate books by use of a special set of Lerena and Princess Raja invoice books. Many sales made in the names of these companies, which had previously been merged with one or the other of the corporate defendants, were entered by Kiamie's chief bookkeeper, Bernstein, on these special invoice books which were secreted from most of the other employees, and were never routed to the accounts receivable department for recordation on the regular corporate books. Other sales were concealed by falsely voiding sales invoices. After the customer's check in payment for the merchandise covered by the invoice had been received, Kiamie would instruct Bernstein to mark the office copy of the invoice "void" as if the sale had never been made. Invoices so marked were not recorded by the accounts receivable department and, therefore, were not reported on the tax returns. False credit memoranda were used to conceal other sales. After merchandise had been shipped to a customer and the customer's check received in payment, Kiamie would instruct Bernstein to prepare a credit memo falsely indicating that the merchandise had been returned. The effect was to cancel the sale just as if the merchandise had in fact been returned.

Kiamie himself opened the mail and segregated the customers' checks received in payment of the unrecorded sales. The checks received in payment for the unrecorded sales were then given to Bernstein in batches. At Kiamie's instructions she secretly noted "received payment" on the double set of sales invoice books, voided the invoice, or entered a false return memo, according to the method of concealment employed. A memorandum listing the checks in the batch was then prepared and the checks were delivered to one of two check cashers, or to one Lothstein, an attorney on Kiamie's payroll, to be cashed at one of two secret bank accounts which Lothstein had opened for Kiamie at the Manufacturers Trust Company. Checks deposited in these secret accounts were marked with the symbol endorsement of the Chase Discount Company, which Lothstein created for the purpose of cashing Kiamie's checks, but were not endorsed by Kiamie or by the defendant corporations. Kiamie concealed the unrecorded sales and secret bank accounts from his accountants and, except for the few he relied on to obtain cash or to assist him in the concealment of the records, his employees as well.

We think it obvious that this evidence established a prima facie case of wilful tax evasion. Concealed sales of about $640,000 were proved, or an evasion of about $400,000 of income taxes. The elaborate scheme of concealment included nearly all the badges of fraud listed by the Supreme Court in Spies v. United States, 1943, 317 U.S. 492, 499, 63 S.Ct. 364, 368, 87 L.Ed. 418:

"* * * keeping a double set of books, making false entries or alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely

effect of which would be to mislead or to conceal."

Thus, unless the jury was required to accept appellants' evidence as establishing a complete defense, the jury's verdict must be sustained. Each of the three major phases of appellants' defense—unrecorded black market purchases, substitution of intercorporate sales for unrecorded sales, and application of gross profit percentages to gross sales—will therefore be briefly discussed.

*Unrecorded black market purchases.* Proof of unrecorded cash purchases of goods equal in amount to the unrecorded sales would have constituted a complete defense if appellants had not contended that the income taxes of the defendant corporations had been computed by a gross profit percentage method which disregarded the cost of goods sold. Even then, proof of such purchases had a vital bearing on the issue of appellants' fraudulent intent since it offered an explanation for the elaborate scheme used to conceal sales. But the evidence was not such that the jury was required to accept this explanation.

It is undisputed that the Kiamie enterprises made large-scale black market purchases of goods. Kiamie's accountant Gellin had advised Kiamie to obtain the cash needed for such dealings by cashing checks drawn on the regular corporate bank accounts to the order of cash. Some $648,000 of corporate checks had been cashed in this manner, and the Government had allowed this amount in full as unrecorded cash purchases. The issue at the trial was whether, and to what extent, black market purchases in excess of this $648,000 were made from the cash obtained by cashing the customers' checks received in payment for unrecorded sales.

Although appellants presented convincing evidence that some such purchases had been made, other evidence entitled the jury to believe that the unrecorded sales were not used solely as a source for black market cash. The total amount of unrecorded purchases, excluding those allowed by the Government because the cash was obtained from corporate accounts, did not tally with the total amount of unrecorded sales. The fact that the unrecorded sales continued into late 1946, after wartime shortages had eased, permitted the inference that the unrecorded sales were not used solely for black market purchases. And, too, the Government's evidence disproved certain cash purchases relied on by appellants. The defense never explained why Kiamie kept the unrecorded sales and secret bank accounts from his accountants, although he had no compunction about discussing his black market dealings with them. Finally, the absence of records to support the claimed purchases was itself a factor which the jury could consider.

*The intercorporate transactions.* Appellants' primary defense was that various intercorporate transactions entered in the books of the Kiamie corporations were a substitute record for the unrecorded sales and that taxes were paid on these "intercorporates." There is evidence that intercorporate transactions were so entered in order to allocate costs among the Kiamie enterprises. And there is evidence, relied on by appellants, that many of these entries were entirely fictitious. Appellants contend that the testimony of Batzer, an outside accountant who analyzed the intercorporate transactions prior to trial, required the jury to bring in verdicts of acquittal since Batzer concluded that the total amounts of unrecorded sales and intercorporates over the indictment period were approximately the same. We disagree.

Batzer's analysis revealed that the intercorporate sales commenced before and continued long after the unrecorded sales; that not one unrecorded sale matched an intercorporate sale; that the monthly totals for all corporations of unrecorded sales never matched the monthly totals for the intercorporate sales; that the total intercorporate sales of all corporations for the period of the unrecorded sales, August 1943 to July

1946, was over $400,000 greater than the unrecorded sales; and that the total intercorporate sales of each corporation did not match its unrecorded sales. These discrepancies, considered together with the evolution of varying explanations advanced by Kiamie, discussed at an earlier point in this opinion, entitled the jury to treat the intercorporate sales defense with skepticism. Here again, the absence of records, including the tape totals which Kiamie claimed to have used in substituting intercorporate sales for unrecorded sales, was a factor which the jury could consider. It is also significant that not one employee of Kiamie testified that the intercorporate sales were entered as substitutes for unrecorded sales, even though several of them would have been in a position to know it if this had been done.

*The use of gross profit percentage figures.* Appellants attempted to prove that the defendant corporations, despite contrary statements in their tax returns, did not compute their taxes from accurately kept inventories but by the use of gross profit percentages. They also attempted to show that the gross profit percentages computable from the figures on the tax returns were reasonable and honest ones. The jury was entitled to disbelieve both of these claims.

The evidence reveals that Kiamie never discussed his gross profit percentage with is accountants and that he arrived at the figure by computations of his own. No records were made or kept by him of this operation. The tax returns reflect a gross profits percentage of approximately 17 per cent although OPA maximum prices permitted a gross profit percentage figure of 30 to 40 per cent. Though the OPA figures disregard overages in purchases, the jury was entitled to believe that the claimed profit figure of 17 per cent was too low. Other circumstances create doubt even on the use of gross profit percentages in computing the tax returns, particularly the circumstance that the percentages, when computed from the figures shown in the returns, turn out to be expressed in

hundred thousandths of one per cent. Surely the jury was entitled to believe that a man of Kiamie's loose accounting habits would not compute his gross profit percentage, for example, as 16.23473 per cent—the relationship of gross profit to gross sales found on the 1946 tax return of defendant Kiamie Manufacturing Co., Inc. The substantial differences in the gross profit percentages of the five Kiamie corporations in any given year, and from year to year, justified doubts *that such percentages were in fact used.*

### 3. *Rulings on Evidence*

Appellants contend that the trial court committed reversible error (a) by failing to permit the jury to give Exhibit MQ full probative force, (b) by excluding Exhibit NX, and (c) by admitting the Government's Exhibits 330, 331, 332 and 333. These rulings will be briefly reviewed.

Exhibit MQ was a schedule of purported black market cash purchases which had been prepared by Bernstein sometime between October 1947 and July 1948. At the latter time it was delivered to the Government attached by a staple to a schedule of unrecorded sales prepared by Bernstein under Gellin's supervision (Exhibit 229). The schedule of unrecorded sales (Exhibit 229) was received during the Government's case as proof of the facts stated therein, while the schedule of cash purchases (Exhibit MQ) was received during appellants' case as an explanation of what had been done with the proceeds of the unrecorded sales. Appellants contend that MQ was an integral part of 229 and that it should have been admitted at the same time and given the same probative effect.

The matter arose in this way. After the 1947 conference with the revenue agents, Kiamie's representative Gellin promised agent Troy that he would prepare a schedule of the unrecorded sales. Thereafter, Kiamie supplied Gellin with the necessary records and with his chief bookkeeper, Bernstein, who prepared the schedule under Gellin's supervision. This schedule of unrecorded sales, Exhibit 229, was initially received in evi-

dence as a documentary summary based on Gellin's testimony as to its preparation. Later in the trial, however, the trial court came to consider it as an admission of defendants and the jury was permitted to give it that effect.

The related schedule of unrecorded cash purchases, Exhibit MQ, was Kiamie's explanation of how the proceeds of the unrecorded sales had been used. It was not admitted with 229 because Gellin testified that it had not been prepared under his supervision and that he had not examined the underlying documents allegedly supporting it. Although Kiamie claimed that these documents once existed, they were never produced and were said to be missing at the time of the trial. Despite this absence of documentary support MQ was subsequently admitted as a 1947 explanation on the part of appellants that the proceeds of unrecorded sales were used to make cash purchases, but it was not admitted as proof of the facts stated therein.

■ We think that this ruling was not erroneous. MQ was nothing more than unsupported hearsay. It would not have been admissible at all were it not for the fact that Kiamie had attached it to 229 before delivering them both to the Government. 229 having been properly treated as an admission, MQ could be treated as an exculpatory portion of an admission or as an explanation of an admission. See Waters v. Kings County Trust Co., 2 Cir., 1944, 144 F.2d 680, 682, certiorari denied 1944, 323 U.S. 769, 65 S.Ct. 121, 89 L.Ed. 615; Jayne v. Mason & Dixon Lines, 2 Cir., 1941, 124 F.2d 317, 319; 7 Wigmore, Evidence §§ 2100, 2113 (3d ed. 1940). It could not properly be given any further effect.

■ The other evidence rulings complained of appear to us to be well within the discretion of the trial court. Exhibit NX was a list of purported cash purchases not on the corporate books which Batzer prepared for the defense. It was not merely an accountant's summary of records, but necessarily reflected Batzer's evaluation of the credibility of witnesses. Also, its preparation rest-

ed on numerous assumptions, some of which were unwarranted by the evidence. We will not upset the trial court's discretionary ruling that this exhibit was "highly unfair" and would have misled the jury. See United States v. Altruda, 2 Cir., 1955, 224 F.2d 935, 942; Steele v. United States, 5 Cir., 1955, 222 F.2d 628, 629–630; United States v. Johnson, 1943, 319 U.S. 503, 519–520, 63 S.Ct. 1233, 87 L.Ed. 1546.

■ Government Exhibits 330, 331, 332 and 333 were drafts of the New York City gross receipts tax returns of the defendant corporations. They were admitted after the bookkeeper who had prepared them under Kiamie's direction had testified that she had been instructed by Kiamie to deduct the intercorporate sales from gross sales to obtain the gross receipts figure. Even though the draft returns were not the final returns and tended to show the commission of an independent crime, we think the trial court did not abuse its discretion in admitting them as the best available evidence in support of the Government's contention that the intercorporate sales represented cost allocations rather than substitute recordings of the unrecorded sales.

#### 4. Conduct of the Prosecutor

■ Finally, appellants contend that misconduct of the prosecutor deprived them of a fair trial. Although the trial was long and sometimes heated, we think that nothing occurred which requires a reversal. Argument to the jury by the prosecutor that Kiamie had "pocketed" the cash from unreported sales was permissible under the circumstances of the case, since the Government had proved a diversion of $7,000 to Kiamie's personal bank accounts. Proof that Kiamie talked to one of his trusted employees, Joseph, who had helped him conceal unrecorded sales, in Arabic, a language not understood by others present, can scarcely be attacked as prejudicial because the jury might have thought erroneously that Kiamie was an Arab. In any event, the defense

**934**

made it quite clear to the jury that Kiamie was not an Arab. We are disturbed that the prosecutor stated at the close of his summation his personal belief "that on the facts in this case we have no alternative but to bring back a verdict of guilty on all four counts against Fareed Kiamie and the corporations." But defense counsel had already stressed to the jury his belief in appellants' innocence, and thus, as the trial court put it, placed "the prosecution in the position of having to say, 'Well, I, too, believe in the case that I have been presenting.'" See Lawn v. United States, 1958, 355 U.S. 339, 78 S.Ct. 311, 323 note 15, 2 L.Ed.2d 321; Henderson v. United States, 6 Cir., 1955, 218 F.2d 14, 19, 50 A.L.R.2d 754, certiorari denied 1955, 349 U.S. 920, 75 S.Ct. 660, 99 L.Ed. 1253.

We conclude that the convictions must be affirmed.