Raymond PATRIARCA, Defendant, Appellant,

v.

UNITED STATES of America, Appellee.

Ronald J. CASSESSO, Defendant, Appellant,

v.

UNITED STATES of America, Appellee.

Henry TAMELEO, Defendant, Appellant,

v.

UNITED STATES of America, Appellee.

Nos. 7126–7128.

United States Court of Appeals
First Circuit.

Oct. 14, 1968.

Certiorari Denied Jan. 20, 1969.
See 89 S.Ct. 633.

Francis J. DiMento, Boston, Mass., with whom Charles A. Curran, Providence, R. I., and DiMento & Sullivan, Boston, Mass., were on brief, for Raymond Patriarca, appellant.

Ronald J. Chisholm, Boston, Mass., for Ronald J. Cassesso, appellant.

Joseph J. Balliro, Boston, Mass., for Henry Tameleo, appellant; William E. Searson, III, Boston, Mass., of counsel.

Edward F. Harrington, Asst. U. S. Atty., with whom Paul F. Markham, U. S. Atty., and Walter T. Barnes, Special Atty., Dept. of Justice, were on brief, for appellee.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

COFFIN, Circuit Judge.

These are appeals from judgments of conviction following jury verdicts on an indictment in three counts. The first count charged all of the appellants with conspiracy, in violation of 18 U.S.C. § 371, to travel and use the telephone in interstate commerce with intent both to commit murder to further an unlawful gambling enterprise, in violation of 18 U.S.C. § 1952(a) (2), and to promote such enterprise, in violation of 18 U.S.C. § 1952(a) (3); and thereafter to attempt to commit such murder and acts of promotion. The chief witness for the prosecution, one Baron, was named as a co-conspirator but not a defendant. Other substantive counts charged appellant Tameleo with using a telephone facility in interstate commerce and appellants Patriarca and Tameleo with causing Baron and appellant Cassesso to travel in interstate commerce pursuant to the same intent, followed by an attempt.

The district court is alleged to have erred in denying a motion for continuance and change of venue because of prejudicial publicity; in refusing to grant a mistrial for prosecutorial expression of belief during the closing argument; and in denying various motions to strike part of the indictment, to grant a severance, to enter judgments of acquittal, and to make a requested instruction.

## MOTIONS FOR CONTINUANCE AND CHANGE OF VENUE

Appellants, in alleging error by the court in refusing their motions for continuance and change of venue filed on February 20, 1968 and at the opening of trial on March 4, 1968 refer in their brief to

" * * * a long history of publicity, beginning with the widely publicized 'Valachi hearings', so-called, of 1963, which named the defendant Patriarca as 'Boss' of the New England 'Cosa

Nostra' or 'Mafia' and the defendant Tameleo as one of his subordinates. It is a matter of common knowledge that the publicity, surrounding Patriarca, at least, multiplied and persisted uninterrupted down to May, 1967, when the Government disclosed, in connection with a tax-evasion prosecution in Rhode Island, unconnected with Patriarca, that his office in Providence had been 'bugged' for three years and that both he and Tameleo had engaged in highly compromising conversations with others."

Subsequently, in May of 1967, newspapers in Boston published stories that a Mafia "strongarm", one Joe (Barboza) Baron, had been "singing" to the FBI, referring to appellant Patriarca as a Cosa Nostra boss. Then on June 20, 1967, the date of the indictment in this case, there were more newspaper headlines and accounts concerning all appellants and Baron. The newspaper clippings included as exhibits in the record before us contain no items between July 10, 1967 and October 27, 1967, when appellant Tameleo was named as having been indicted, after grand jury testimony by Baron, for a slaying unrelated to these appeals and as being an aide to "New England Cosa Nostra boss Raymond Patriarca".

On October 30, 1967, pursuant to appellants' first motion for change of venue on July 26, 1967, hearing was had *in camera*. Counsel for appellant Patriarca, alleging nationwide publicity, waived his motion for a change of venue and requested a continuance of four or five months. The court stated that the case would not be tried until after the first of the year and on January 22, 1968 set the date of trial for February 6.

In the meantime, on January 16, 1968, there had been several newspaper accounts of the indictment of appellant Cassesso for conspiracy to incite a fellow prison inmate to confess falsely to a murder. These, however, were of small moment compared to the figurative and literal bombshell of January 30, 1968 when Baron's attorney, John E. Fitzgerald, Jr., was almost killed by a bomb wired to the ignition of his automobile. Widespread reporting of and editorializing on the bombing ensued.

On February 2, 1968, appellants moved for a continuance, which was granted until March 4. On February 20 motions for continuance and a change of venue to New York were filed, hearing was had *in camera,* and the motions were denied on February 27, the court observing in a memorandum that the newspaper articles on which the motions were based concerned the Mafia and Costa Nostra and made no specific reference to defendants; that such articles are constantly appearing in New York as in New England; and that the climate for a fair trial was far more favorable than on October 30, 1967. Similar motions were filed on the day of trial, March 4, based on recent publicity, and were denied for the reasons given on February 27. These two rulings are now before us.

Appellants argue that the prejudice created by the February news accounts, was "the connection of the defendants, in the public's mind, to the bombing incident." The record of newspaper clippings before us, apparently assembled through a clipping service, contains, exclusive of duplications, seventy items from newspapers in Boston and five other major Massachusetts cities covering the period from January 31 to March 4. While not complete and not including any data on television and radio reports, we must take it as reasonably representative. We report the results of our scrutiny in the margin.[1]

---

1. Articles mentioning the bombing and subsequent investigations were published as follows:

| | | |
|---|---|---|
| Jan. 31 – Feb. 6 (1 week) | | 50 |
| Feb. 7 – Feb. 20 (2 weeks) | | 10 |
| Feb. 21 – Mar. 4 (13 days) | | 2 |

In addition, between February 21 and March 4, there were 8 articles reporting only appellants' February 20 request for change of venue and decision thereon. These made no reference to the bombing.

In none of the newspaper accounts were appellants linked with the Mafia or Cosa Nostra or with the Fitzgerald bombing. In none were the acts alleged in the indictment reported. In only one article, published one month before trial, was Baron labelled a Cosa Nostra informer; he was elsewhere uniformly referred to as an underworld or gangland informer. Even more significant are the facts that the amount of coverage diminished sharply after the week following the bombing and that, subsequent to appellants' filing motions on February 20, the subject matter was almost wholly that of the making and disposition of the motions themselves.

Under these circumstances, we cannot say that the court abused its discretion. Indeed, the sharp diminution of decibels after the first week following the Fitzgerald bombing indicates that a month's delay was a realistic estimate. That a rash of stories centered about moves for further delay was inevitable; if such could be ground for continuance, cases would never be tried.

We are mindful of the authorities relevant to this issue. But there is here lacking as of the time of the relevant motions, the kind of incriminating nexus that was present in Rideau v. State of Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963) (out of court confession widely seen); in United States v. Dioguardi, 147 F.Supp. 421 (S.D.N.Y.1956) (publicity of recent trial testimony incriminating defendants); in Delaney v. United States, 199 F.2d 107 (1st Cir. 1952) (widely publicized Congressional hearings on the "scandal" involving defendant); in Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1958), and in Coppedge v. United States, 106 U.S.App.D.C. 275, 272 F.2d 504 (1959), cert. denied, 368 U.S. 855, 82 S.Ct. 92, 7 L.Ed.2d 52 (1961) (widespread publicity of excluded or inadmissible information).

■ Nor do we find a suggestion of the kind of prejudicial statements or records of conviction, arrests, or indictments emanating from a public official, zealous attempts by the media to arouse a community on a particular trial, reports of refusal to submit to certain tests, pejorative characterizations of a defendant, description of evidence against the accused or reports of plea negotiation cited as presenting the "greatest hazards" to a fair trial by the ABA, Standards Relating to Fair Trial and Free Press, (Tentative Draft, Dec. 1966), pp. 25–40.[2]

Following the denial of the motions for continuance and change of venue, there was another opportunity for counsel to mitigate any possible effect of pretrial publicity—on the voir dire. Counsel for one of the appellants requested that the court "ask a question of the jury in connection with this case, in the light

---

Only two articles (apart from one report of the court's memorandum of February 27, summarized above) mentioned the Cosa Nostra, these occurring a month before trial. Two of three articles mentioning Baron as a government witness appeared over a month before trial as did two references to Fitzgerald being a possible witness.

There was only one reference to appellants Cassesso and Tameleo, this in connection with another indictment. Of the fourteen references to appellant Patriarca, one referred to the indictment, five to the February 2 postponement, and eight to the February 20 motion for change of venue.

2. What we have said on the issue of pretrial publicity also disposes of appellants'

motions for severance which were sought on the same basis as the original motions for change of venue, preceding the continuance granted on October 30, 1967, and not thereafter renewed. Absent "a strong showing of prejudice", Sagansky v. United States, 358 F.2d 195, 199 (1st Cir.), cert. denied, 385 U.S. 816, 87 S.Ct. 36, 17 L.Ed.2d 55 (1966), which we do not find here, it is customary to try conspirators together. Opper v. United States, 348 U.S. 84, 95, 75 S.Ct. 158, 99 L.Ed. 101, 45 A.L.R.2d 1308 (1959). To the extent that claimed prejudice may arise from association with others, such association would be revealed in any event from the factual situation presented at the trial.

of all the publicity." The court replied that it would "put to them a general question and ask them if there is any member of the jury here who feels that he would not be able to give the defendants a fair and impartial trial." Counsel said, "Fine, thank you, your Honor." The question was put. No response was forthcoming. The court stated that it assumed that all were "in agreement on this particular question." The jurors were then sworn and thereafter sequestered.

■ While the court did all that was requested at this juncture, and cannot under the circumstances of this case be charged with error in not inquiring further, *sua sponte,* we feel bound to concede that such a single question posed to the panel en bloc, with an absence of response, achieves little or nothing by way of identifying, weighing, or removing any prejudice from prior publicity. In cases where there is, in the opinion of the court, a significant possibility that jurors have been exposed to potentially prejudicial material, and on request of counsel, we think that the court should proceed to examine each prospective juror apart from other jurors and prospective jurors, with a view to eliciting the kind and degree of his exposure to the case or the parties, the effect of such exposure on his present state of mind, and the extent to which such state of mind is immutable or subject to change from evidence. In this we are in accord with the suggestions of section 3.4 of ABA, Standards Relating to Fair Trial and Free Press, (Tentative Draft, Dec. 1966), pp. 130–137.[3]

### PROSECUTORIAL SELF-REFERENCE

■ Appellants seek not only reversal of their convictions but judgments of acquittal because of the conduct of the prosecutor in injecting his own belief into his closing argument. They describe the comment as "outrageous", in bad faith, and utterly unprovoked by any defense argument. Appellee denies that any comment was made by the prosecutor expressing personal belief in the testimony and that even if such comment were to be so interpreted, it was justified by the "vicious attacks" of appellants' counsel. Finally, appellee argues that the comment could not have been prejudicial. We disagree with all but the last of these positions. We hold that the comment was a prohibited one, to which timely objection was made, that it could not be justified by the argument of appellants' counsel, even though parts of such argument might be interpreted as provocation, but that there was no possibility of its prejudicing the jury under the circumstances of this case. F.R.Crim.P. 52(a).

This conclusion stems from our evaluation of the challenged comment against the background of all the arguments which we now summarize. The gist of the alleged conspiracy was a plan involving the appellants and Baron to kill one Marfeo, the proprietor of a gambling establishment in Providence. This establishment, which continued to operate after once being raided, had caused overt police surveillance in the area to increase to the point where it caused a decline in the patronage of another gambling establishment in which appellant Patriarca allegedly had an interest. Marfeo refused Tameleo's and Patriarca's requests to cease operations and the decision was made to kill him. Baron and appellant Cassesso agreed to do the job, travelled to Providence and viewed places such as restaurants and bars which Marfeo was known to frequent. Further action was postponed since the police had learned of Tameleo's and Patriarca's dispute with Marfeo.

The testimony of Baron was central to the prosecution's case. All of the evi-

3. These pages of the tentative draft were specifically endorsed by the Report of the Committee on the Operation of the Jury System on the "Free Press-Fair Trial" Issue, p. 39 n. 37. This Report was formally approved by the Judicial Conference of the United States on September 19, 1968.

dence of the plan, the phone calls, other conversations, travel, and visits to Marfeo's haunts to implement the plan came from his lips. Other witnesses, principally police and federal agents, filled in the background—the raid on Marfeo's establishment, Marfeo's continued operations, accelerated surveillance in the area, a police request to appellant Patriarca to try to persuade Marfeo to close shop, the large scale gambling activities of appellant Tameleo, the identification of places Marfeo frequented.

Baron was a highly vulnerable witness. Not only had he spent almost half of his life in prison, but he had been assured that he would not be indicted for the crime at issue here if he testified before the grand jury. In addition he was told that his cooperation in this matter would be brought to the attention of the prosecution in other pending criminal cases. Money from his unlicensed loan operations continued to be sent to him while in prison. Fears for the safety of his wife and child led to her being allowed to live with him in protective custody. On at least two occasions discussions were had on his behalf with writers relating to a book based on his revelations and movie rights, both promising large returns. Letters which he sent from prison referred to FBI representatives saying to him "If you help us, we will help you"; to the purpose of his transfer to the Barnstable House of Correction as being "to brainwash me"; to having "a few aces" up his sleeve; to his doing something sensational with the result that "30 would go" whether innocent or not. After he began to talk to the FBI about the subject matter of this case, there were some fourteen visits in each of which he would add some new detail either previously overlooked or concealed.

Appellants' three counsel zeroed in on their target. They touched all the bases in vigorous, evocative language. The theme was clearly enunciated in these words of the argument: "I say to you that Mr. Barboza—Mr. Baron—is just a liar. That his story is fiction, and it was made up, coolly calculated, in that very cold blood that he admits he has and for very good reasons." Counsel then colorfully delved into the reasons which he described as "the most tremendous inducements for anybody to lie * * * sex, * * * liberty, and * * * money."

In the course of the ensuing argument for the defense, on the whole proper and evidence-oriented, counsel occasionally made remarks which could be construed as either a personal belief or an attack on the integrity of the prosecution. A failure to introduce evidence alluded to in the prosecution's opening, because of defense counsel's objection, was made the basis for rhetorically asking the prosecution where the promised witnesses were and for remarking to the jury that "that was put in your mind". The word "inducement" was used six times.[4]

The problem with "inducement" is that it does not merely mean "motive". Its primary meaning is "the act or process of inducing", Webster's Dictionary (3d Int. Ed.) p. 1154; it can be easily understood as connoting purpose on the part of the prosecution as well as response on the part of the prospective witness. This possible understanding was reinforced by an appellant's counsel stating, "He is not going to be found guilty of anything" —implying without foundation in the evidence that, with regard to other prosecutions pending against Baron, more than calling the attention of the prosecutor to his cooperation had been promised. A similar observation may be

---

4. The analysis of the evidence began with the statement "I don't think they [sex, liberty, money] necessarily have to be argued in any particular order, but let's try it this way: inducement." One example referred to the promise of immunity from indictment for the present offense in the words: "I suggest that it is a pretty darned good inducement for some of them to lie and say anything he might think somone wants them to say, because what the heck he doesn't have to worry, he is not going to be indicted."

made of counsel's question whether the fact Baron was allowed to live with his wife was "because he is delivering something? Is that the consideration for his being with his wife?" Again the interpretation of a two-way bargain between the prosecution and Baron for incriminating testimony is not unreasonable. Another oblique remark is a reference to the government's "advantage of everything else they might have going for them here". So also with "Now let me get back to show you the type of job that they are trying to do on my client. * * *" and "* * * I'm going to show you the artfulness in this thing."

One counsel for appellants occasionally also spoke in a way permitting the inference that personal belief was being expressed. For example, "When * * * [Baron] looked at [counsel who was cross-examining] in a cold stare and he said yes, and I have seen a lot of things and I have tried murder cases but it made me wince, and do a little shuddering"; "* * * I believe the evidence was that not one of these persons is guilty"; "* * * I think [a verdict of not guilty] is justified by the evidence."

Counsel for the prosecution began by paraphrasing the defense as saying that "* * * Baron's testimony is not fact, it's fiction." He added, "If you accept that, you also accept the fact that that fiction was written, produced and directed by the United States Attorney's office, by the Federal Bureau of Investigation, by the police in Revere and the police in Boston. * * *" Objection was taken and the argument was ordered stricken. The prosecutor then addressed himself to the theme of the defense that Baron had made up the story he told. He sought to verify it by corroboration from other witnesses. In his catalogue of corroboration he cited testimony that Baron knew Tameleo and Cassesso, that Marfeo was running a crap game, that Tameleo was a large scale gambler, that a Providence police captain told Patriarca that he wanted the Marfeo gambling operation closed down, that there was a raid, reconstruction of the premises, renewed operations, increased surveillance or "heat", that Baron's description of the interiors of places of alleged conversations and observations was both detailed and not challenged, that Baron's identification of Marfeo hangouts checked with police identification.

At this point the prosecutor noted the coincidence of police identification of Marfeo hangouts as of a time prior to the alleged conspiracy with that of Baron. He asked if that was fiction. Then he said, "I say that is an insult to your intelligence, and I also say that if Joe Baron is guilty of making it fiction, then I am guilty of making it fiction, and the FBI is guilty of making it fiction and every other witness who testified in this case is guilty of making up fiction." Objection was taken but the court said "That may be argued" and the questioning continued.

A short time later the argument concluded and counsel for appellants moved for a mistrial, citing as a second reason the above quoted argument. The court, referring to its prior ruling at the commencement of the prosecution's argument, asked if the prosecutor had again "put himself in the picture". The prosecutor said, "No, Judge. I said if this is fiction, then every witness who appeared here is fiction." When asked again by the court "You weren't a witness. Did you put yourself in there?" the prosecutor answered, "I asked a few leading questions on occasion, Judge." The court noted that all lawyers commit such an error and denied the motion for mistrial. The case was adjourned overnight and the jury was charged the following day.

The question sharply posed by appellants is whether Rule 15 of the Canons of Professional Ethics of the American Bar Association, as applied by us in Greenberg v. United States, 280 F.2d 472 (1st Cir. 1960), has been violated. Greenberg (having to do with a flagrant self-vouching of a prosecutor as a "thirteenth juror") thrusts farther than

Rule 15 and some other judicial authorities. Rule 15 proscribes a lawyer from asserting a personal belief in his client's innocence or the justice of his cause. Such authorities as Lawn v. United States, 355 U.S. 339, 359–360 n. 15, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958); Gradsky v. United States, 373 F.2d 706, 710 (5th Cir. 1967); United States v. Medlin, 353 F.2d 789, 795 (6th Cir. 1965), cert. denied, 384 U.S. 973, 86 S.Ct. 1860, 16 L. Ed.2d 683 (1966); Jones v. United States, 119 U.S.App.D.C. 213, 338 F.2d 553, 554, n. 3 (1964); and United States v. Battiato, 204 F.2d 717 (7th Cir.), cert. denied, 346 U.S. 871, 74 S.Ct. 118, 98 L. Ed. 380 (1953) seem to define the impermissible conduct as any expression of belief which indicates that the prosecutor is relying on information other than that which has been presented in court.[5] *Greenberg* proscribes expression of personal belief in the testimony, not only because counsel would then in effect be a witness not under oath or subject to cross-examination but because the false issue of credibility of counsel, with government having the advantage, would be injected.

■■ In *Greenberg* we recognized that at times "special circumstances" may justify a reply but found no such circumstances. Nor do we find such here. We concede that the prosecutor could interpret parts of the defense argument as a subtle, veiled attack on the prosecution's motives and integrity. But we cannot say that counsel for appellants deliberately indulged in excessive argu-

ment. At most their comments, as we have endeavored to show, were cloaked in ambiguity. Moreover, if seriously disturbed, counsel for the government concealed that fact for he raised no objections. At least under these circumstances we do not consider that a trespass by the defense gives the prosecution a hunting license exempt from ethical restraints on advocacy.[6]

Coming to the prosecutor's remarks, we observe first that just as the defense argument was ambiguous, so were these. In context, the prosecutor was pointing to corroborating items of testimony given by police and other witnesses, such as places Marfeo was known to frequent, which matched testimony given by Baron. He was arguing that either such items were true or false. If false, not only one police witness was lying, but all were. And since the instruments of the lies were the prosecutor who asked the questions and the witnesses who answered them, it could arguably be said that on this hypothesis the statement that he was "making fiction" was simply factual and not a statement of belief.

This interpretation, while arguable, is not probable. A more likely interpretation is that this was a back-handed way of laying one's credibility on the line. Prosecuting attorneys and law enforcement officials wear an invisible cloak of credibility by virtue of their position; to make it explicit may too easily tip the scales. Moreover, the same play on the "fiction" metaphor had overcarried earlier, stimulating an objection which was sustained.

---

5. Appellants argue that the prosecutor's reference to the FBI, when only one agent testified, implied that that agency was in possession of secret evidence. We think it clear from the context, however, that the reference was to the corroborating evidence adduced in court which the prosecutor had just summarized.

6. Our approach may differ from some other circuits. If such cases as Baiocchi v. United States, 333 F.2d 32, 38 (5th Cir. 1964); Isaacs v. United States, 301 F. 2d 706, 737 (8th Cir.), cert. denied, 371 U.S. 818, 83 S.Ct. 32, 9 L.Ed.2d 58

(1963); United States v. Kiame, 258 F.2d 924, 934 (2d Cir.), cert. denied, 358 U.S. 909, 79 S.Ct. 236, 3 L.Ed.2d 230 (1958); Ochoa v. United States, 167 F. 2d 341, 344 (9th Cir. 1948); Malone v. United States, 94 F.2d 281, 288 (7th Cir.), cert. denied, 304 U.S. 562, 58 S.Ct. 944, 82 L.Ed. 1529 (1938) stand for the proposition that the mere fact that there has been provocation by the defense justifies retaliatory expression of belief which would otherwise be error, we respectfully disagree. At most, we feel, serious provacation would be weighed as a factor in evaluating possible prejudice.

Nevertheless, viewing the case as a whole, the arguments, and the charge, we cannot find any possibility of prejudice. First, while the case depended wholly on the credibility of Baron's testimony, all of the many factors which made it susceptible to impeachment were fully presented and fully argued. The occasional oblique expressions of opinion from both sides against the background of a long trial, much evidence on the issue, and lengthy argument addressed to the evidence could not loom sufficiently large to have influence.[7]

Second, all available timely action was not taken to confront the court with the precise language which had been used. The nature of the objection was not clear to the court at the time, as the subsequent colloquy in the motion for mistrial indicated. The appellants see bad faith in the prosecutor's turning off the court's inquiry with a quasi-humorous admission, in answer to a question whether the prosecutor had been a witness and injected himself into his argument, that he had indeed asked a few leading questions. While the prosecutor's answer was clearly not responsive, we do not understand from oral argument that it was devious or calculated to mislead, there having been a superficial response accepted as such at that point. In any event it is clear both that the court did not recall the precise language which the prosecutor had used and that counsel did not feel it important enough to have such language read back. There is an obligation on counsel to make a reasonable effort to see to it that the court has before it the facts on which a requested ruling is predicated. Cf. Corley v. United States, 124 U.S.App.D.C. 351, 365 F.2d 884, 885 (1966); Camps v. New York City Transit Authority, 261 F.2d 320, 323 (2d Cir. 1958). Had this been done, the court, even if it is likely that a mistrial would not have been granted, could have taken pains to devise a proper instruction. For this was not such an egregious comment as to be incurable. As it was, the charge was not given until the following day. The court did include a general instruction that only the evidence must be considered. No special requests were made on this point and no objections taken.

For these reasons we deem this error harmless within the meaning of Fed.R. Crim.P. 52(a).

### OTHER ALLEGED ERRORS

Two other asserted errors related to the fact that Baron was named in the in-

---

7. Our survey of cases involving expression of personal belief has revealed reversals for far grosser improprieties than were exhibited here. See, e. g., Greenberg, supra; Gradsky, supra, ("[The government] has every opportunity to check out and judge the credibility and truthfulness of Mr. Zane and Mr. Gilmore in this case, and in that context * * * we offered you this testimony."); Dunn v. United States, 307 F.2d 883, 885 (5th Cir. 1962) ("This case is replete with fraud and is one of the most flagrant cases we have ever tried in the Southern District of Georgia.").

We have also noted gross improprieties not resulting in reversals. See, e. g., Del Cristo v. United States, 327 F.2d 208, 209 (5th Cir. 1964) ("My final word, ladies and gentlemen, is my sincere belief—and again I must say that defendant's counsel lead you to believe that I don't believe this story, that I am here because I have a job to do—but I believe this man is guilty of the crime charged or I would not be standing here right now prosecuting him. * * * *"); Henderson v. United States, 218 F.2d 14, 19, 50 A.L. R.2d 754 (6th Cir.), cert. denied, 349 U.S. 920, 75 S.Ct. 660, 99 L.Ed. 1253 (1955) ("I am going [to prosecute] * * * if I believe a man guilty. And if I don't believe he is guilty, no one is going to make me * * * prosecute him * * *."); United States v. Battiato, supra, 204 F.2d at 719 ("If I, in my own mind, thought for one minute that these defendants were not parties to this case I certainly would not have the courage to stand up here and argue before you that they were guilty. It is never our intention to prosecute and try innocent men.")

All of these relied to some extent on the justifying effect of provocation, which we have said we do not recognize as automatically absolving the prosecutor.

We have found no case reversing for a statement of as marginal an impropriety as that here considered, whether or not provocation was present.

dictment as a co-conspirator but not a defendant. The first is that this form of the indictment stemmed from improper prosecutorial influence on the grand jury. The second is that in the course of trial the court went out of its way to say that the government had the privilege not to indict a co-conspirator and in so doing undercut defense efforts to impeach Baron's "inherently suspect testimony".

■■ The first point is based solely on pre-grand jury promises by the prosecutor to Baron that he would not be indicted if he testified. Testimony from an accomplice in a criminal conspiracy is often a *sine qua non* for effective prosecution. Hoffa v. United States, 385 U.S. 293, 311, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). Such testimony will often not be available in the absence of a prosecutor's commitment to grant immunity from prosecution for the criminal acts which are the subject of such testimony. Whether or not a promise of immunity from indictment is technically within the prosecutor's unfettered power to implement, cf. United States v. Cox, 342 F.2d 167 (5th Cir. 1965), cert. denied, Cox v. Hauberg, 381 U.S. 935, 85 S.Ct. 1767, 14 L.Ed.2d 700, and Fed.R.Crim.P. 48 (a), it is highly improbable that a grand jury, on understanding the circumstances resulting in Baron's testimony before it, would indict him. This is entirely proper. Here there is no suggestion of anything more, such as participation by the prosecutor in the deliberations of the grand jury which occurred in United States v. Wells, 163 F. 313 (9th Cir. 1908). Nor have appellants cited any authority requiring that Baron's designation in the indictment as a "coconspirator but not as a defendant" be struck under the circumstances of this case.[8]

■ Appellants' second contention, that the court erred in twice interjecting the comment in the course of cross-examination about the promise that Baron would not be indicted if he testified to

the grand jury, that it was the government's privilege not to indict a co-conspirator as a defendant, is no more substantial. Not only was this a correct statement of the law, *Cox*, supra, but defense counsel made no objection to the first *sua sponte* comment by the court nor to the same instruction in the final charge. The impeaching effect of the promise of immunity from indictment was not only fully argued at trial but overargued when counsel said "He is not going to be found guilty of anything". The court's charge contained standard provisions both as to assessing credibility in general and as to scrutinizing the testimony of an accomplice with great care. Nothing more was requested. We see no error.

■ Appellants' final argument is that motions for judgments of acquittal on the substantive counts were improperly denied because of a failure of any evidence to establish an "attempt" to commit a crime of violence. Both sides agree, however, that the imposition of concurrent sentences on both the conspiracy count and the substantive counts would require decision on this issue only in the event of a new trial.

Affirmed.

---

8. Had the district court granted the request and stricken these words, we do not see how appellants' position would

have been improved. The facts surrounding Baron's testimony would necessarily be the battleground of the case.