*Decisions will be entered under Rule 50.*

GORDON D. SEIGLE, BETH ANNE SEIGLE, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 69050–69055. Filed November 17, 1959.

*Robert K. Eifler, Esq.*, and *Richard A. Mullens, Esq.*, for the petitioners.

*John W. Dowdle, Jr., Esq.*, for the respondent.

MULRONEY, *Judge:* The respondent determined deficiencies in Federal income tax for the year 1953 as follows:

| Petitioner | Docket No. | Deficiency |
|---|---|---|
| Gordon D. Seigle<br>Beth Anne Seigle | 69050 | $42,969.24 |
| Thomas E. McGovern<br>Deloris V. McGovern | 69051 | 15,264.65 |
| Stanley T. Keller<br>Anne M. Keller | 69052 | 15,429.61 |
| Philip J. Sweeney, Jr.<br>Martha H. Sweeney | 69053 | 13,976.41 |
| Estate of Ethel Armstrong, Deceased, Paul R. Armstrong, Executor, and Paul R. Armstrong, Surviving Husband | 69054 | 15,146.37 |
| Cecil G. Church<br>Anna K. Church | 69055 | 12,440.88 |

The issue in these consolidated cases is whether Spartex & Co., a partnership, correctly computed its cost of goods sold in the taxable periods ended May 31, 1953, and October 31, 1953.

---

[1] The following proceedings are consolidated herewith: Thomas E. McGovern, Deloris V. McGovern, Docket No. 69051; Stanley T. Keller, Anne M. Keller, Docket No. 69052; Philip J. Sweeney, Jr., Martha H. Sweeney, Docket No. 69053; Estate of Ethel Armstrong, Deceased, Paul R. Armstrong, Executor, and Paul R. Armstrong, Surviving Husband, Docket No. 69054 and Cecil G. Church, Anna K. Church, Docket No. 69055.

FINDINGS OF FACT.

Some of the facts have been stipulated and they are hereby incorporated by this reference.

Petitioners, Gordon D. Seigle and his wife, Beth Anne, Thomas E. McGovern and his wife, Deloris, Stanley T. Keller and his wife, Anne, and Cecil G. Church and his wife, Anna, are residents of Alexandria, Virginia. Petitioners Philip J. Sweeney, Jr., and his wife, Martha, and Paul R. Armstrong and his wife, Ethel (until her death in 1954), were residents of Arlington, Virginia. Petitioners filed joint income tax returns for 1953 with their respective wives with the district director of internal revenue at Richmond, Virginia.

Gordon D. Seigle, Thomas E. McGovern, Stanley T. Keller, Philip J. Sweeney, Jr., Paul R. Armstrong, and Cecil G. Church were partners in Spartex & Co. They will hereinafter sometimes be referred to as petitioners. Spartex & Co. (hereinafter referred to as Spartex) was a partnership formed pursuant to an agreement executed on July 1, 1952. The respective interests of the partners in the partnership were as follows: Seigle, 33 per cent; McGovern, 14 per cent; Keller, 14 per cent; Armstrong, 14 per cent; Sweeney, Jr., 13 per cent and Church, 12 per cent. Seigle was the controlling and managing partner of Spartex.

On July 1, 1952, Seigle, for himself and as nominee for the remaining partners in Spartex, entered into an agreement with Aircraft Supplies, Inc., a corporation organized and existing under the laws of New Jersey, to purchase from Aircraft Supplies, Inc., a certain bulk stock, or lot, of surplus aircraft propeller parts and assemblies consisting of over 1,500 different items, in many instances boxed and in preservatives, and in many instances the quantity of each item varied from one to many thousands. The items consisted of parts for aircraft manufactured during the years 1940 through 1944 and they ranged from complete propeller assemblies weighing several hundred pounds to small bearings, springs, and similar items. Hereafter we will sometimes refer to this bulk stock or lot of surplus aircraft propeller parts and assemblies as the assets. The said contract provided that Spartex pay $300,000 for the assets and assume an obligation of $19,020.01 in connection with certain items among the assets. The agreement provided for a payment of $50,000 upon execution of the agreement and for monthly payments of $16,500 until the balance of $250,000, with interest, was paid in full. On the date of the agreement Seigle made a cash payment of $50,000, which he borrowed from a bank in his own name, and also executed a negotiable promissory note in the amount

of $250,000 as security for the balance of the purchase price. The note was guaranteed by the other partners in Spartex. The indebtedness to Aircraft Supplies, Inc., was fully paid by October 1953.

The assets had been owned by a partnership, J. P. Kurtz & Company, doing business in Alexandria, Virginia. J. P. Kurtz & Company had acquired these assets from the Aircraft Components Corporation, which, in turn, had acquired them from an agency of the Federal Government. Sometime prior to July 1, 1952, Aircraft Supplies, Inc., purchased the partnership interests of the two partners in J. P. Kurtz & Company, discontinued the business of the partnership, and discontinued the services of its key employees. At the time Aircraft Supplies, Inc., purchased the partnership interests it agreed that "if it disposed of said aircraft propeller parts and accessories in bulk, it would first offer them to said key employees for said sum of Three Hundred Thousand Dollars." The key employees were Seigle and the other partners of Spartex. None of the partners of Spartex had any interest of any kind in Aircraft Supplies, Inc.

Seigle has been engaged in the business of buying and selling surplus aircraft parts since 1946. From 1946 to 1950 he was employed as vice president and sales manager by the Aircraft Components Corporation, and from 1950 to the time of its dissolution he was employed as sales manager by J. P. Kurtz & Company. As a result of this employment, Seigle was very familiar with the lot of surplus aircraft parts acquired by Spartex.

Spartex was formed solely to acquire the assets it did acquire from Aircraft Supplies, Inc., and to engage in the business of selling these items. Spartex made no other purchases of such items during its existence, and all of its income was derived from the sale of the assets. Spartex operated as a wholesale dealer of surplus aircraft parts. All of the sales by Spartex from its assets were made through Specialties, Inc., and Exports, Inc., both of which are retail dealers of surplus aircraft parts. During 1952 and 1953 Spartex allowed its retail dealers discounts of approximately 15 per cent for domestic sales and 20 per cent for foreign sales. Seigle owned 25 per cent of the stock in Specialties, Inc., and was its president from the time of its formation in 1948 up to the time of the trial. The other stockholders in Specialties, Inc., were McGovern, Keller, Sweeney, Jr., Armstrong, and Church, all partners in Spartex, each of whom owned a 15 per cent stock interest. Seigle was also vice president and general manager of Exports, Inc., which corporation had the same stockholders as Specialties, Inc.

During its first taxable year from July 1, 1952, to May 31, 1953, Spartex's gross sales, exclusive of dealer discounts, were $363,380.71 and during its second taxable period from June 1, 1953, to October 31, 1953, Spartex's gross sales, exclusive of dealer discounts, were $92,035.63. During its first taxable period Spartex granted dealer discounts to Specialties, Inc., and Exports, Inc., in the approximate amount of $79,000.

In September 1953 Seigle and the other partners in Spartex made a list of the items then remaining in the assets and placed a total value on these items of approximately $750,000 for the purpose of negotiating their sale to Hamilton Standard Propellers, a manufacturer. This value was based, in part, upon various manufacturers' list price sheets, some of them going back to 1942, covering the items remaining in the Spartex assets. Seigle and his partners offered these items to Hamilton Standard Propellers for a price ranging from $650,000 to $750,000, but Hamilton did not make the purchase.

On October 31, 1953, subsequent to the unsuccessful attempt to sell the remainder of the assets, Spartex was dissolved. Each of the partners sold his partnership interest in Spartex to Specialties, Inc., and the total purchase price paid for all the partnership interests was $730,900. At the time of the sale the partners had placed a value on the remaining assets of Spartex, which was a substantial portion of the original assets, at approximately $650,000. On the partnership return of income filed by Spartex for the taxable period ending October 31, 1953, the assets on hand as of that date was shown as $11,934.47. The partners received payment for their partnership interests partially in cash and partially in the form of notes, and on their income tax returns for 1953 each of the partners reported his gain realized from the sale of his partnership interest as a long-term capital gain, electing to do so under the installment method.

Spartex did not allocate the cost of the bulk lot of surplus parts on an item by item basis, and it did not use an inventory method in computing its cost of goods sold for the two taxable periods of its existence. Instead, Spartex adopted a percentage-of-sales method for computing cost of goods sold for the taxable period ended May 31, 1953, it computed its cost of goods sold, as follows:

Sixty-six per cent of the sum of gross sales ($363,380.71) plus dealer discounts ($79,000) for period ended May 31, 1953_____ $291,971.06

Plus: Obligation in respect of materials sold in period ended May 31, 1953, assumed by Spartex on purchase of said materials_____ 19,020.01

Cost of goods sold_____ 310,991.07

In the taxable period ended October 31, 1953, Spartex incurred reworking costs in the amount of $10,903.04 on materials sold in that period, and this was the only amount claimed by Spartex for cost

of goods sold in its return of income for that period. In its partnership returns of income for the taxable periods ending May 31 and October 31, 1953, Spartex reported gross profit from sales in the amounts of $52,389.64 and $81,132.59 respectively.

Respondent, in his notice of deficiency, recomputed Spartex's cost of goods sold for the periods ended May 31, 1953, and October 31, 1953, in the amounts of $109,753.69 and $27,797.98, respectively, and in doing so used 30.2035 per cent as the percentage of sales. Respondent's computations were as follows:

| | |
|---|---:|
| Gross sales by Spartex in period ended May 31, 1953 | $363, 380. 71 |
| Gross sales by Spartex in period ended October 31, 1953 | 92, 035. 63 |
| Value as of October 31, 1953, of Spartex assets on hand at that time | 649, 856. 08 |
| Total sales price attributed to entire assets | 1, 105, 272. 42 |
| Cost of assets to Spartex: | |
| Assets purchased on July 1, 1952 | $300, 000. 00 |
| Reworking and reconditioning costs incurred in period ended May 31, 1953, on goods sold in said period | 3, 905. 53 |
| Obligation in respect of materials sold in period ended May 31, 1953, assumed by Spartex on purchase of said materials | 19, 020. 01 |
| Reworking and reconditioning costs incurred in period ended October 31, 1953, on goods sold in said period | 10, 903. 04 |
| Total cost of assets to Spartex | 333, 828. 58 |
| Commissioner's computation of cost of goods sold as a percentage of sales (333,828.58/1,105,272.42) | 30. 2035% |
| Commissioner's computation of Spartex's cost of goods sold: | |
| In period ended May 31, 1953 ($363,380.71 x 30.2035%) | $109, 753. 69 |
| In period ended October 31, 1953 ($92,035.63 x 30.2035%) | 27, 797. 98 |
| Total cost of goods sold as computed by Commissioner | 137, 551. 67 |

Respondent recomputed Spartex's gross profit from sales in the periods ended May 31 and October 31, 1953, in the amounts of $253,627.02 and $64,237.65, respectively, or a net increase in gross profit for the two periods of $184,342.44.

## OPINION.

The issue is whether the partnership, Spartex, correctly computed its cost of goods sold in the taxable periods ended May 31, 1953, and October 31, 1953. Spartex made sales of $363,380.71 and $92,035.63 in the periods ended May 31, 1953, and October 31, 1953, and adopted a percentage of sales method for determining its costs of goods sold. Respondent determined that 30.2035 per cent was, under the peculiar facts of these cases, a more accurate figure to use

to reflect Spartex's income during its short life. Respondent, at the trial, explained his position as follows:

> It is important to keep in mind that respondent's position here is not based on a contention that the partnership should change its method of computing cost of goods sold. The partnership chose to use the percentage of sales method and respondent has not denied its right to the use of this method.
>
> What the Commissioner does contend is that under the peculiar facts here present the partnership improperly used this method in such a manner that partnership income was grossly distorted.

Petitioners contend that the respondent's action in recomputing Spartex's cost of goods sold was an arbitrary one. We do not agree.

Spartex was engaged in selling its stock of surplus aircraft propeller parts and assemblies. The problem here is how much it could deduct as cost of goods sold. The purpose, of course, in deducting any amount as cost of goods sold is to return to the sellers the actual cost of the items being sold before taxing any profit. Any method which would return to Spartex, tax free, more than their actual cost would distort income and would be unacceptable for that reason. Petitioners adopted a method and used it apparently from July 1, 1952, until May 31, 1953, which, if continued, would have returned to them, tax free, much more than the actual cost of the items sold.

Where the production, purchase, or sale of merchandise is an income-producing factor it is necessary, in order to correctly reflect net income, that inventories be kept at the beginning and end of each taxable year. Sec. 22(c), I.R.C. 1939.[2] Regs. 118, sec. 39.22(c)–1. The purpose of inventories is to assign to each taxable period its profits and losses, *United States Cartridge Co.* v. *United States*, 284 U.S. 511. No inventories were ever taken by Spartex, and no attempt was ever made to allocate cost to the various portions of the original bulk purchase.

The evidence does not establish that the partnership could not have established a proper opening inventory at cost as of July 1, 1952. Indeed, it indicates affirmatively that it could have started with an opening inventory at cost which would have avoided all of the problems now in this case. There were insufficient records and data to enable the Commissioner to reconstruct any opening or closing inventories. Under these circumstances respondent had to adopt some method that would allow Spartex to recover costs and clearly reflect the income.

Under section 41 of the Internal Revenue Code of 1939 it is provided that where the method of accounting employed by the taxpayer "does not clearly reflect the [net] income, the computation [of net

---

[2] All section references are to the Internal Revenue Code of 1939, unless otherwise noted.

income] shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect the income." It is evident that under section 22 (c), with the regulations pertaining thereto, and section 41, the respondent is allowed great discretion in finding a method, when necessary, which will clearly reflect a taxpayer's net income. There is no merit in the petitioners' argument that the respondent's exercise of his discretion in these cases was arbitrary. Respondent adopted the same percentage-of-sales method of computing cost that Spartex used because, as he states, "under the peculiar facts of these cases as they stand, that method, if properly used, can provide a means of recomputation that will properly reflect income." He used a different percentage figure and our concern, therefore, is whether Spartex's cost of goods sold percentage clearly reflects its income for the two periods before us or whether the respondent's percentage comes closer to the desired result.

At the outset, it is obvious that the percentage figure chosen by Spartex could not possibly come from its own experience since the partnership was formed with the acquisition of the assets. Spartex's accountant advised the partnership to use the per cent of gross sales of other companies engaged in the sale of surplus aircraft parts. There was testimony that this would run in the vicinity of 65 to 75 per cent of gross sales. Neither of the two witnesses used by the petitioners was actually acquainted with the affairs of Spartex, but they merely testified as to general practice in the surplus aircraft parts industry.

It must be stressed that such evidence is no more than a guide in choosing a proper percentage for Spartex. We are not sure that the fact situation of Spartex was at all comparable to that of the rest of the industry. It may be true that a member of the industry, in continuous operation over the years, may expect to have its cost of goods sold equal about 70 per cent of its gross sales. This does not mean that another member of the same industry, such as Spartex, cannot be a unique case, with bulk assets, some of which have high profit potential which is unusual in the industry. We can accept the average performance figures of an industry only if we are convinced that Spartex's situation was comparable to an average member of the industry. We do not think it was.

The evidence suggests rather plainly that the assets acquired by Spartex in 1952 had an extraordinary profit potential. We do not agree with the petitioners' argument that we must accept the purchase price, $300,000, as the true measure of the value of the assets purchased. The sales contract under which the assets were sold by Aircraft Supplies, Inc., to Spartex reveals that the seller was

obligated to make a first offer of sale of this bulk lot of surplus parts for $300,000 to the very persons who became partners in Spartex. It is obvious that this figure had been predetermined under a contractual obligation. The total amount of sales made by Spartex in the two periods ending May 31, 1953, and October 31, 1953, in excess of $450,000, is certainly evidence of this profit potential in the bulk lot purchase. Sometime in September or October 1953, Spartex offered the remaining assets for sale to a manufacturer for a price ranging from $650,000 to $750,000. The sale was not made. On October 31, 1953, the partners in Spartex sold their partnership interest to Specialties, Inc., for a total purchase price of $730,900, and at the time of the sale the partners in Spartex placed a value on the remaining surplus parts, which was a substantial part of the original assets, of approximately $650,000. The partners in Spartex owned all of the stock in Specialties, Inc. All this evidence indicates rather forcefully that Spartex's return from gross sales would be much higher than the general experience of the industry as a whole. It is apparent that the assets purchased by Spartex were quite unique and any comparison with the general experience of others in the same industry is greatly weakened by this fact.

We think that the percentage figure used by Spartex for its cost of goods sold is untenable. Spartex's total cost of its assets was about $333,000, and in its first period of operation, or 11 months, it charged off more than 93 per cent of this total cost against the sales of that period of approximately $363,000. Yet the bulk of its assets still remained on hand, with only about 7 per cent of the original cost left to charge off against future sales. The amount of the remaining assets is indicated by Spartex's sales of about $92,000 in its second period of operations lasting some 5 months and by the fact that Spartex sold the balance of its assets to a corporation on October 31, 1953, for more than $700,000. These figures graphically demonstrate the distortion in Spartex's income for the two periods of its existence. It also appears that Spartex was not consistent in using its adopted method of computing cost of goods sold by a percentage of sales. In its second period of operations it did not deduct 66 per cent of gross sales as cost of goods sold as it had in its first period, but merely deducted from its gross sales the actual reworking and reconditioning costs in the amount of $10,903.04 incurred by it in that period.

We have indicated in our Findings of Fact the respondent's method of arriving at 30.2035 as a percentage of sales and we need not repeat it here. It is enough to point out that the computation is based upon Spartex's gross sales for its two periods of operations ($363,-

380.71 and $92,035.63) and upon the value ($649,856.08) placed by Spartex on its remaining assets on October 31, 1953. In effect, the respondent computed 363,380.71/1,105,272.42 of $333,828.58 (total cost) as the cost of goods sold for the first period of operations, and 92,035.63/1,105.272.42 of $333,828.58 as the cost of the goods sold in the second period of operations. Under the circumstances of these cases, we believe that this approach is an eminently fair one and the most satisfactory one at hand. It has been approved by this Court. In *American Industrial Corporation*, 20 B.T.A. 188, the taxpayer purchased personal property consisting of thousands of items, and it made no attempt to compile any inventory partly because it would have been very expensive. Respondent found it necessary to determine the cost of goods sold by the same method, as he did in the cases before us. We upheld this method as a valid one.

Petitioners attempt to show error in the respondent's method of computing cost of sales by an argument that is based on a partial allocation of costs to certain items. They argue that on July 1, 1952, when Spartex purchased the bulk lot of surplus parts, some 14 items out of the more than 1,500 items in the lot had a value of about $200,000, that on the same date the remainder of the assets had a value of about $90,000, and that the $300,000 cost should be allocated approximately $207,000 to the 14 items and $93,000 to the remainder. Since, the argument continues, about 86 per cent of these 14 items was sold in Spartex's first period of operations, the cost of goods sold in that first period is at least $178,000 (86 per cent of $207,000), to which should be added the further costs of that first period in the amounts of $3,905.53 and $19,020.01.

This argument rests on too many assumptions which are simply not supported by sufficient evidence in the record. If the values attributed by the petitioners to the two segments of the bulk lot of surplus parts are without support then the whole allocation argument made by them must fall. In making the above allocation the petitioners seem to assume that the value of the bulk lot of surplus parts on July 1, 1952, was approximately $300,000, which is the same as the purchase price paid for the lot. Apparently this value is based on Seigle's testimony that the 14 items had a "readily marketable value based upon the market conditions * * * I knew at the time that I went through this inventory. On the other items I didn't know. I could not ascertain an immediate ready market value for the items." It appears to us incredible that Seigle should borrow $50,000 in his own name for the downpayment and execute a negotiable promissory note for $250,000 as security for the balance

of the purchase price if the resale value of the surplus parts was not more than $300,000.

Another weakness in the figures used by the petitioners is that the major portion of the assets, to which the petitioners give a value of about $90,000 in July 1952, suddenly acquired a value of about $650,000 in less than a year and a half. Seigle testified that this dramatic rise in value was the result of "quite a number" of events which took place "during the spring and toward the fall of 1953." Some of these events were a change in the aircraft overhaul policies of the Armed Forces which resulted in increased demand for surplus aircraft parts; an increase in air coach travel; an increase in overall passenger travel on airplanes; a growing scarcity of surplus parts for existing airplanes which had been manufactured only during the years 1940 through 1944; an increase in the use of planes by private corporations; and other factors. There is no evidence that these events occurred with the suddenness which petitioners claim, i.e., during the 16 months of Spartex's existence. Such changes occur more gradually, and, as Seigle testified, there is a "certain anticipation" about them. For all we can tell, these events may have been anticipated by the market in July 1952, and this could well be the reason that Seigle and the other petitioners chose to make the bulk lot purchase at that time for a very favorable price.

Another puzzling thing about petitioners' argument is that the 14 items, ostensibly consisting of surplus parts which purportedly had a value of about $200,000 in July 1952, remained stable at that value throughout the same period when the other surplus parts in the bulk lot soared from a value of about $90,000 to more than $650,000. We are not told why these economic events did not also affect the 14 items. We think that with these serious uncertainties in the record as to the true value of the various segments of the assets, especially on July 1, 1952, we cannot accept petitioners' allocation of the original cost as reasonable or accurate.

Respondent's computation of Spartex's cost of goods sold in the taxable periods ended May 31, 1953, and October 31, 1953, is sustained.

Petitioners contend that if "the evidence petitioners have adduced were to be rejected, then the accounting method adopted by petitioners and approved by respondent * * * would require a determination that Spartex's entire $333,828.58 cost of goods was chargeable against gross sales before Spartex realized any gross income." This is the full statement of the argument in the petitioners' brief, which also cites cases in its support.

It by no means follows that if the petitioners' evidence as to the 66 per cent cost of sales figure is rejected, we must decide that the entire cost should be recovered before Spartex realizes any gross income. It is difficult to see why these are the only alternatives. Spartex chose to use the percentage-of-sales method to compute its income, though we think the record indicates it could have used inventories. Because of the circumstances, respondent agreed to its use. The only dispute was over the correct percentage to be used. Now Spartex is, in effect, seeking to change its method of reporting income to something else. There is no justification whatever for its doing so.

Nor do we believe that the cases cited by the petitioners are applicable here. The principle of these cases is succinctly expressed in *William T. Piper*, 5 T.C. 1104, at page 1109:

the rule has become established that, where a mixed aggregate of assets is acquired in one transaction, the total purchase price shall be fairly apportioned between each class so as to determine profit or loss on subsequent sale of specific assets in the group. If such apportionment be impractical, no profit shall be realized until the cost shall have been recovered out of the proceeds of sales. * * *

It is the exceptional situation where an allocation of the cost price cannot be made. In some of the cases where this Court held that allocation was impracticable and permitted a taxpayer to recover his cost basis before reporting any income, there was serious doubt whether the taxpayer would *ever* recover his entire cost basis. See *United Mercantile Agencies, Inc.*, 23 T.C. 1105; *Inaja Land Co., Ltd.*, 9 T.C. 727; see also *Burnet* v. *Logan*, 283 U.S. 404. At any rate, we do not believe that Spartex was unable to allocate some of its original cost to the items sold by it in the periods ended May 31 and October 31, 1953. Lists were available at all times of the items in the bulk lot. In fact, the petitioners themselves used the lists of the items in September 1953 and were able to compute a valuation of the bulk lot by comparing each item with available manufacturers' lists. This same thing could have been done when the bulk lot was first purchased. Also, it is evident from Seigle's own testimony that he was thoroughly familiar with the assets and that at the time of purchase he was able, on the basis of market conditions, to place values on different segments of the bulk lot of assets. In short, on the basis of the record, we do not believe that Spartex lacked "a proper, rational, or reasonably accurate basis for allocating to each individual item a part of the cost." *United Mercantile Agencies, Inc., supra.*

*Decisions will be entered for the respondent.*