UNITED STATES of America,
Appellee,

v.

Louis CRAMER and Minnie K. Cramer,
Defendants-Appellants.

Nos. 719 and 720, Dockets 35267
and 35268.

United States Court of Appeals,
Second Circuit.

Argued June 7, 1971.

Decided July 23, 1971.

Oakes, Circuit Judge, dissented and filed opinion.

Louis Bender, New York City (Boris Kostelanetz, New York City, and Richard B. Thaler, Ithaca, N. Y., of counsel), for appellants.

James M. Sullivan, Jr., U. S. Atty., N. D. N. Y., Syracuse, N. Y., for appellee.

Before FRIENDLY, Chief Judge, HAYS and OAKES, Circuit Judges.

FRIENDLY, Chief Judge:

Louis Cramer and his wife Minnie, partners in an auto parts business in Ithaca, New York, appeal from their conviction after a jury trial in the District Court for the Northern District of New York, of willful tax evasion, 26 U.S. C. § 7201, and willful assistance in the preparation of false tax returns, 26 U.S. C. § 7206(2). The four-count indictment charged in substance that the Cramers had understated by $74,839.61 their taxable income on their joint income tax return for 1962 (Count 1) and by $55,466.70 for 1963 (Count 2), and that, with respect to the same tax years, they had willfully assisted in the preparation of their materially false partnership returns by (1) overstating purchases, (2) failing to report purchase discounts, (3) overstating sales returns and allowances, and (4) overstating New York Disability and Group Hospital Expenses (Counts 3 and 4). The jury returned a verdict of guilty on all four counts against each defendant, although the basis of its decision on Counts 3 and 4 was limited to "reported purchases of merchandise." [1] The defendants received the sentences stated in Part VI below.

For many years, Louis and Minnie Cramer were partners in Cramer's Auto Parts Co., a wholesale jobber of auto parts whose sales were principally to garages and gas stations. Louis waited on the trade behind the counter and purchased the parts sold in the store; Minnie helped in the office and assisted in the bookkeeping. During the years in question, Judge Louis Thaler, senior partner in the law firm of Thaler and Thaler, prepared the Cramers' tax returns on the basis of information they supplied to him.

1. The form of verdict submitted to the jury permitted it to indicate the specific basis or bases on which its finding of guilt with respect to Counts 3 and 4 was predicated. The jury returned a verdict "based on section (a) Reported purchases of merchandise." We read this as meaning that the jury did not find the Cramers guilty with respect to the errors "(b)," "(c)," and "(d)," in reporting the purchase discounts, the sales returns and allowances, and the hospital and disability expenses.

212

The stimulus for the investigation that led to the prosecution of this case was a similar investigation undertaken by the New York State tax authorities. As a result of the latter, a settlement was reached whereby the Cramers paid a 5% negligence penalty in addition to the tax (and interest) due the State. Apparently pursuant to an agreement between state and federal tax authorities, the Internal Revenue Service was notified of the state examination and settlement, and the Service then commenced its own investigation.

The federal investigation was undertaken by Agents Hurban and Sager. Agent Hurban examined the books and records of Cramer's Auto Parts Co.— consisting of the cash disbursements journal, the cash receipts journal, the cancelled checks, bank statements, and sales invoices. A comparison of the results of this examination with the figures reported on the Cramers' partnership returns revealed, with respect to the items specified in Counts 3 and 4, unreported income in the amounts specified in Counts 1 and 2. In addition, a number of conferences were held between the agents and the Cramers, Judge Thaler, his son and associate Richard, and James Barrett, an accountant hired by Thaler and Thaler in connection with the New York State investigation. In the course of these meetings, the agents obtained information concerning appellants' financial picture during the years in question as well as the manner in which the returns were prepared. On the basis of information so obtained, and much documentary evidence, proof was adduced at trial to corroborate the specific deficiencies in reported income by showing an increase in appellants' net worth and expenditures above that reported as taxable income (and unexplained by increases from nontaxable sources) of about $74,000 for 1962 and $38,000 for 1963.[2]

Appellants did not take issue with the factual accuracy of the asserted deficiencies in reported income resulting from the failure to report purchase discounts, the overstatement of sales returns and allowances, and the overstatement of New York Disability and Group Hospital Expenses. They claimed that these were a function of errors by others on whom they relied to prepare their returns (or the underlying figures therefor), a claim the jury apparently believed. See fn. 1 *supra*. With respect to the overstatement of purchases which constituted the bulk of the deficiency, however, the appellants contended that they properly reduced the gross profit margin reflected on their own books and records (by an upward adjustment in the figures for purchases) to one in accord with the national average for auto parts wholesalers, because the former was "way out of line" with the latter. Alternatively, they contended that even if the method was not proper, they relied on the advice of their attorney, Judge Thaler, who informed them that it was—a contention, which, if believed, would tend to negate the element of "willful" tax evasion which the Government was required to prove.

As to the net worth proof, appellants' principal contention relates to the use of the inventory figures on which the Government relied in part in establishing valuations of appellants' assets at the beginning and end of the years in question. Although the Government employed the inventory figures reported on appellants' tax returns, it is now contended that these inventories were obsolescent and use of them in a net worth analysis would necessarily overestimate appellants' net worth.

While this is but a crude outline of the detailed factual presentation at trial, the relevant details may be more appropriately developed in the context of appellants' legal contentions.

2. The net worth "bulge" for 1962 was almost identical to that proved by the specific item method; the "bulge" for 1963 was $17,000 less than that proved by the specific item method.

## I. *The Failure to Record the Grand Jury Testimony*

Agent Sager was apparently the only witness who testified before the grand jury which returned the indictment against the Cramers. According to the Government's memorandum in the district court, "[a]s of the date of the indictment herein, to wit, March 27, 1969, minutes of grand jury proceedings were not taken in [the Northern] District, except in major criminal cases." Since the instant prosecution presumably was not deemed to be a "major criminal case," no stenographer was present to record Agent Sager's grand jury testimony, and consequently this was not available for possible use as impeachment. Appellants claim that this failure constituted a denial of due process.

The Cramers rely principally on our decisions in United States v. Youngblood, 379 F.2d 365 (2 Cir. 1967), and United States v. White, 417 F.2d 89 (2 Cir. 1969), cert. denied, 397 U.S. 912, 90 S.Ct. 910, 25 L.Ed.2d 92 (1970), for the proposition that we have established a rule in this circuit requiring that all grand jury testimony be recorded. In *Youngblood*, we directed that at trials commencing after June 21, 1967, the date of our judgment in that case:

> the district courts of this circuit at the request of the defendant should order that the defendant be allowed to examine the grand jury testimony of those witnesses who testify at his trial without requiring him to show any particularized need for this material.

379 F.2d at 370. We also noted, *id.* at n. 4, that

> [i]t is our understanding that stenographic minutes of grand jury proceedings in our circuit are now regularly taken and filed away. However, this may not have always been the practice, and where it has not been we do not imply that a defendant is entitled as of right to minutes that do not exist.

Two years later in *White*, a case arising in the Northern District and involving the nonrecordation of the grand jury testimony of one of the key prosecution witnesses, we held the trial testimony of the witness admissible, but noted that "[h]ad this failure [to record the grand jury testimony] occurred subsequently to our decision in *Youngblood*, . . . very possibly a different question would have been presented." 417 F.2d at 92.

In United States v. Ayers, 426 F.2d 524 (2 Cir.), cert. denied, 400 U.S. 842, 91 S.Ct. 85, 27 L.Ed.2d 78 (1970), we were presented with a district judge's refusal to order the transcription of post-*Youngblood* grand jury testimony which had been recorded. We there held that "such an order is a matter of discretion for the trial judge, depending upon the circumstances of the particular case." 426 F.2d at 529. In support of this conclusion we noted that "[a]lthough recordation as a matter of course certainly is the better procedure, . . . this combination of rule and footnote in *Youngblood* (quoted above) does not require in terms that all grand jury testimony be recorded" and that "[f]ailure to record testimony given before a Grand Jury seems still a matter about which a defendant has no right to complain." 426 F.2d at 529 and n. 1. Hence, while *Youngblood* made it clear that a defendant is entitled as a matter of right to examine the transcribed grand jury testimony of witnesses who testify at trial, insofar as this relates to their trial testimony, *Ayers* makes it equally plain that a defendant is not entitled to a reversal of his conviction simply because testimony before the grand jury which returned an indictment against him has not been recorded. This is the position taken by every court which has considered the problem, see, *e. g.*, Nipp v. United States, 422 F.2d 509 (10 Cir. 1969), cert. denied sub nom. Bishop v. United States, 397 U.S. 1008, 90 S.Ct. 1235, 25 L.Ed.2d 420 (1970); Loux v. United States, 389 F.2d 911 (9 Cir.), cert. denied, 393 U.S. 867, 89 S.Ct. 151,

21 L.Ed.2d 135 (1968); United States v. Turner, 274 F.Supp. 412 (D.Tenn. 1967); see also United States v. Caruso, 358 F.2d 184 (2 Cir.), cert. denied, 385 U.S. 862, 87 S.Ct. 116, 17 L.Ed.2d 88 (1966) (pre-*Youngblood*), and is in accord with the permissive language of F.R.Cr.P. 6(d) which states that "a stenographer or operator of a recording device *may* be present while the grand jury is in session" (emphasis supplied).

Moreover, this would be the worst possible case in which to announce, on a retroactive basis, a *per se* rule of exclusion of the testimony of a witness whose grand jury testimony was not recorded. Shortly after each conference between the agents and appellants, their attorneys, and their accountant, Agent Sager prepared detailed memoranda recording what transpired. These made reference to such matters as Louis Cramer's admission that he made the adjustment to purchases without informing Judge Thaler—an item in Sager's trial testimony on which appellants particularly rely in asserting that the unavailability of his grand jury testimony prejudiced them. But inasmuch as these reports, prepared prior to Sager's grand jury testimony and turned over to the defense pursuant to 18 U.S.C. § 3500, were fully consistent with his trial testimony, it would be perverse indeed to predicate a reversal of the conviction on the remote possibility that Sager might have presented the grand jury with a version of the facts different from that reported contemporaneously in his memoranda and later at trial. While appellants raise the spectre of arbitrary and discriminatory prosecutorial conduct in selecting those cases in which grand jury testimony will be recorded, it will be time enough to deal with such a problem when, as, and if a defendant comes forth with any evidence suggesting bad faith on the part of the Government—something appellants have utterly failed to do here.

■■■ We do not mean to imply by the above discussion that we approve of the practice which has been and, so far as we have been informed, still is followed in the Northern District. We reiterate that "recordation as a matter of course certainly is the better procedure." We hold only that the failure to record grand jury testimony of a prosecution trial witness—at least absent any evidence of prosecutorial misconduct—does not constitute a sufficient ground for reversal. Formulation of a general principle that all grand jury testimony must be recorded is a matter which may more appropriately be disposed of in the current revision of the Federal Rules of Criminal Procedure or by the Circuit Councils in the exercise of their supervisory power.

II. *Adjustment of Purchases on the Partnership Return to Reflect the National Gross Percentage of Profit for the Industry*

Appellants assert that both by his "disparaging and disruptive remarks" and by his charge, the trial judge interfered with an effective presentation of the defense contentions. The only claim of even colorable merit under this rubric involves the propriety of appellants' upward adjustment of purchases on their partnership return in order to bring their gross percentage of profit into line with the industry average.

During the years in question, Louis Cramer provided Judge Thaler with the data, derived from the books of Cramer's Auto Parts Co., so that the latter could prepare the Cramers' tax returns. After preparing rough drafts of the returns for 1962 and for 1963, Judge Thaler informed Louis Cramer that the books revealed a gross profit figure of approximately 40%. Cramer responded that "it was impossible with the discounts I give, and what we sell the material for, and what the national average was. It runs 30 percent. The best I could do was 31." Agent Sager testified that Cramer told him that, without informing Judge Thaler, he "made the adjustments"—increasing the purchase figures and thereby reducing his gross profit

margin to approximately 30%, in line with the industry average. Judge Thaler, whose testimony contradicted Sager's with respect to who made the actual changes in the purchase figures, explained that he made the adjustments "based on information which was submitted to me, and which was, as I believed, the national average, and was informed was the national average." When questioned as to the propriety of making such an adjustment, Judge Thaler responded that "I felt it was my duty to make a return the way it was indicated it should be made. If it was his [Louis Cramer's] belief, and I had no reason to disbelieve him, if it was his belief that his was the same as the national average, I felt it was my duty to do it that way." When questioned further as to whether the percentage-of-profit figure was reached on the basis of actual purchases, Judge Thaler replied: "No, it was figured on the basis of the national average as I understand the Commissioner does." Later in the course of the trial, after hearing additional testimony concerning appellants' method of calculating their partnership income, the court instructed the jury that "income tax returns are not based on averages, they are based on figures, except where the Internal Revenue Code permits certain fixed averages, such as in relation to local taxes and things of that nature." Appellants argue that this instruction was erroneous and that it removed one of their principal contentions from the jury's consideration.

It is not disputed that an upward adjustment in the purchase figures, as reflected in appellants' books and records, was made on their partnership returns in order to arrive at a gross percentage of profit for Cramer's Auto Parts which was more in line with the industry average than the percentage actually disclosed. Appellants nevertheless urge the somewhat novel contention that *despite the existence of detailed books and records,* a taxpayer may properly disregard these figures when the profit margin they disclose is substantially higher than the industry average.

In support of this proposition, appellants refer us to two cases in which a taxpayer, on his own initiative, has adopted a gross percentage of profit method in calculating his income. Gordon D. Seigle, 33 T.C. 255 (1959), rev'd on other grounds, 281 F.2d 372 (4 Cir. 1960), and United States v. Kiamie, 258 F.2d 924 (2 Cir.), cert. denied, 358 U.S. 909, 79 S.Ct. 236, 3 L.Ed.2d 230 (1958). It is true that in *Seigle,* the Commissioner did not contend that the use of a percentage of sales method for determining cost of goods sold was erroneous, although he did prevail on his contention that the figure used by the taxpayer was not a proper one. But the crucial fact in that case was that the taxpayer kept no records which would have allowed the use of a "permissible method," 26 U.S.C. § 446(c), of accounting:

> No inventories were ever taken . . . no attempt was ever made to allocate cost to the various portions of the original bulk purchase.

> . . . There were insufficient records and data to enable the Commissioner to reconstruct any opening or closing inventory. Under these circumstances [the Commissioner] had to adopt some method that would allow [the taxpayer] to recover costs and clearly reflect the income.

33 T.C. at 260. Here, by contrast, inventories—of which more hereafter—were taken, and although the record indicates that appellants' method of accounting left room for improvement in some respects, James Barrett testified that the books "were of high quality, as far as they went. As a matter of fact, the cash receipts and disbursements records, I think, were superior. They were better than the 99 percent of the kind of records we find in a business of this size."

*Kiamie* likewise does not support the proposition that a taxpayer possessing detailed books and records may unilater-

ally ignore these in favor of an industry-wide average. No claim was made that the use of a gross percentage of profit method, there employed in order to eliminate alleged distortions in income resulting from intercorporate transactions, was proper as a matter of law. Rather it was offered, and properly so, as a defense to criminal charges—since the jury was entitled to believe, regardless of the propriety of the procedure, either that the gross profit figure accurately reflected income or that the defendants acted in good faith in using it.[3] The trial court's charge adequately apprised the jury of these very defenses:

> [T]he Defendant Louis Cramer contends that the partnership from which substantially all of the joint income was derived, could not have had the gross profit tentatively computed by Louis Thaler because it exceeded the margin of profit on which he and the industry generally operated. He explained to us just what he meant by margin of profit, the percentage of his profit against the selling price. You must determine first whether or not the Defendants received any or all part of the additional income attributed to them by the Government . . . if you find that they didn't . . . of course, you would find them not guilty. . . .

> If you find . . . that the Defendants relied on good faith on Louis Thaler's preparation of the returns and believed that each of the returns correctly showed the income and amount of tax due, then you must find as to such defendant a not guilty verdict, even though you find that the returns were incorrect and the Defendants owed a substantial—owed a tax substantially in excess of that shown to be due on the returns.

▮ Finally, appellants seek to derive, from the Commissioner's statutory authority to compute taxable income under such method as, in his opinion, does clearly reflect income "[i]f no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income," 26 U.S.C. § 446(b), an implied prerogative of a taxpayer to adopt, *sua sponte*, a method of computation which he believes "does clearly reflect income" when, in the taxpayer's opinion, his own books and records are "out of line" with the industry average. Section 446(e), however, makes it perfectly clear that as a general rule

> a taxpayer who changes the method of accounting on the basis of which he regularly computes his income in keeping his books shall, before computing his taxable income under the new method, secure the consent of the Secretary or his delegate.

In light of the existence of appellants' detailed books and records, there was therefore no justification as a matter of law for the Cramers to adopt, without the consent of the Commissioner, a gross percentage of profit method, and the trial court's instruction to that effect was proper. Moreover, as noted above, this very issue was presented to the jury as a matter of defense with respect to criminal intent—regardless of the propriety of the method or, indeed, its accuracy—so that the appellants were hardly deprived of having the jury consider their arguments on this score.

### III. *The Net Worth Proof*

Other than appellants' conclusory and insubstantial allegations that they were prejudiced by the Government's use of a net worth analysis to corroborate the evidence of specific deficiencies in reported income, the only claim of error

---

3. In *Kiamie*, the trial court did not permit the introduction of extensive proof relating to the "intercorporate sales defense" for lack of proof that the corporations used an honest gross profit percentage figure based on "their experience." This court noted, in affirming the conviction, that "Proof that returns were made out by use of an honest gross profit percentage figure calculated in good faith was central to appellants' defense. Requiring appellants to prove an essential element of their defense did not confront them with a new charge or shift the burden of proof." 258 F.2d at 929.

relates to the Government's reliance on the inventory figures revealed by appellants' partnership returns. The principal contention is that since the inventories, which were carried at cost, allegedly included many obsolete items— e. g., pre-World War II Chevrolet running boards, any reliance on inventory figures derived from appellants' records would produce a grossly inflated picture of appellants' assets—and increasingly so with the passage of time.

At the outset, it is important to note that "[t]he use of the term 'net worth' to describe the method used . . . is a possible source of misunderstanding since it connotes 'value.' Actually, this method of prosecution for tax evasion is not concerned with value, but only with actual costs and expenditures." United States v. O'Connor, 237 F.2d 466, 473 n. 6 (2 Cir. 1956).[4] Inasmuch as there appears to be no dispute that inventory was calculated on a cost basis and that there was no change in the methods of determining quantities, costs, or valuations between opening and closing inventories,[5] the increases in the cost basis of the inventory necessarily reflect recent expenditures and were justifiably treated as an increase in the taxpayers' assets.[6] The only question is whether the failure to take account of any marginal decrease during the taxable years at issue (since any mark-down based on

pre-1962 obsolescence is irrelevant in terms of the changes in net worth during 1962–63) in the value of inventory resulting from obsolescence prejudicially distorted the Government's net worth-expenditure analysis.

■■ While it is true that a taxpayer may exclude from his inventory goods which have become entirely unsalable, he must do so when he first learns that the goods are unsalable, he must make the determination item-by-item, and he is not permitted "to reduce values arbitrarily by eliminating a certain percentage as representing the fall in value . . . [since] [a]pproximations are not permitted." 2 Mertens, Law of Federal Income Taxation § 16.24 at 57–58 (1967 rev.). Under these standards, it is highly doubtful that the alleged obsolescence would have made any appreciable difference with respect to the net worth bulges of $74,000 for 1962 and $38,000 for 1963. Moreover, the remote possibility that some reduction of taxable income might have been effected had the appellants been able to substantiate, for 1962 and 1963, some recently discovered obsolescence, is deprived of almost any significance in light of the ample proof of specific items of unreported income which the net worth analysis simply corroborated.

■ Appellants' collateral argument with respect to the inventories—that the

---

4. In a typical net worth prosecution, the Government, having concluded that the taxpayer's records are inadequate as a basis for determining income tax liability, attempts to establish an "opening net worth" or total net value of the taxpayer's assets at the beginning of the year. It then proves increases in the taxpayer's net worth for each succeeding year during the period under examination and calculates the difference between the adjusted net values of the taxpayer's assets at the beginning and end of each of the years involved. The taxpayer's nondeductible expenditures, including living expenses, are added to these increases, and if the resulting figure is substantially greater than the taxable income reported by the taxpayer for that year, the Government claims the excess represents taxable income.

Holland v. United States, 348 U.S. 121, 125, 75 S.Ct. 127, 99 L.Ed. 150 (1954).

5. The appellants also claim that their method of taking inventory over an extended period of time necessarily overstated there inventories. Since there was no claim that this method of calculating inventory was different from that used before, or that it changed during the years in issue, it is not unreasonable to assume that the alleged errors were made consistently and thus had little or no effect on the actual increase in net worth.

6. Of course, if these purchases were not financed from a source of currently taxable income (it is not argued that they were financed by a current non-taxable source) the increases would be offset by either a decrease in appellants' assets or an increase in their liabilities.

investigating agents should have pursued "leads" supplied to them by appellants and their counsel, and that the failure to do so requires a reversal of their convictions, Holland v. United States, 348 U.S. 121, 135–136, 75 S.Ct. 127, 99 L.Ed. 150 (1954)—is untenable on a number of grounds. In the first place, apparently aware of the appellants' contention that the inventory figures were inaccurate, the agents explored numerous "leads" to determine the inventory figures. They examined cancelled checks against the appellants' books and records for the years 1961 through 1964 to determine the amounts of merchandise purchased; for the years 1959 and 1960, with respect to which the agents were furnished with no books or records by appellants, the agents examined the microfilmed checks of Cramer's Auto Parts Co. at the First National Bank & Trust Co. of Ithaca; in addition, a number of suppliers of Cramer's Auto Parts Co. were contacted to ascertain whether they had records of Cramer's purchases—and all but one of those that did testified at trial. Moreover, according to Sager's testimony he had requested the inventory records from Richard Thaler, but was informed by him that there were none available. When these were produced as defense exhibits at trial, Sager stated that he had never seen them before.

Secondly, even assuming that this were a case in which the Government had failed to "track down relevant leads furnished by the taxpayer—leads reasonably susceptible of being checked, which, if true, would establish the taxpayer's innocence," Holland v. United States, *supra*, 348 U.S. at 135–136, 75 S.Ct. at 135, we are not at all persuaded that the rule of *Holland* would be applicable. That case was one in which the Government rested its proof "solely on the approximations and circumstantial inferences of a net worth computation," 348 U.S. at 135, 75 S.Ct. at 135, and the basis of the rule permitting the trial judge to consider uninvestigated leads as true and

to take the case from the jury was that the Government's case would thereby be rendered insufficient. 348 U.S. at 136, 75 S.Ct. 127. Here, irrespective of the net worth evidence, the proof of specific items was more than sufficient to take the case to the jury; hence it is questionable whether there would be any justification under the rationale of *Holland* for taking the case from the jury when the Government's net worth analysis is but one string on its bow and its proof of specific items is sufficient.

Beyond all this, the "leads" here were quite as available to the defendants as to the Government. As we said in United States v. Vardine, 305 F.2d 60, 63 (2 Cir. 1962), "it is reasonable to require the defendant, if he wishes to disprove intent and likely source, to bear the burden of going forward when he alleges that he had additional deductions not claimed on his income tax return." Here appellants did little more than make a broad allegation of "25% obsolescence" in inventory—a fact which, if true, they should have supported by some concrete indications that during the tax years in question such obsolescence would have reduced their taxable income.

IV. *The Trial Court's Charge*

Appellants raise a number of objections to the charge, but only two merit comment. With respect to the net worth issue, specific reference is made to several portions of the charge which might have been stated with greater clarity. The only exception taken to this aspect of the instruction, however, concerned the question of the accuracy of the opening net worth figures and the jury's duty to disregard the net worth proof if these were not established to a reasonable certainty—a point the court was careful to clarify to the apparent satisfaction of defense counsel. Bearing in mind the Supreme Court's admonition that

[c]harges [in net worth cases] should be especially clear, including, in addition to the formal instructions, a summary of the nature of the net worth

method, the assumptions on which it rests, and the inferences available both for and against the accused,

Holland v. United States, *supra*, 348 U.S. at 129, 75 S.Ct. at 132, Judge Port's charge satisfied these criteria. He explained the nature and the essential elements of the net worth-expenditure method of proof in terms that were comprehensible to a jury. In any event, with the limited exception noted above, appellants' vigilant trial counsel, who was at no loss to bring numerous objections to other aspects of the charge to the attention of the court, took no issue with this part of the instruction, F.R.Cr.P. 30, and we are certainly not prepared, especially in light of the proof by specific items, to characterize whatever shortcomings there might have been in the charge as plain error, F.R.Cr.P. 52(b).

■ In their requests to charge, the appellants sought an instruction to the effect that evidence of good reputation may alone create a reasonable doubt of guilt. The court charged that evidence of good reputation "may be considered with the other evidence in the case, and may in connection with the other evidence, be sufficient to raise a reasonable doubt in your mind . . . ." An exception was taken by defense counsel. In United States v. Minieri, 303 F.2d 550, 555 (2 Cir.), cert. denied, 371 U.S. 847, 83 S.Ct. 79, 9 L.Ed.2d 81 (1962), we noted that "under certain circumstances [character] testimony alone may raise a reasonable doubt as to the defendant's guilt, and in the federal courts the defendant is entitled to such an instruction," citing Michelson v. United States, 335 U.S. 469, 476, 69 S.Ct. 213, 93 L. Ed. 168 (1948) and Edgington v. United States, 164 U.S. 361, 366, 17 S.Ct. 72, 41 L.Ed. 467 (1896). Although the appellants were therefore entitled to such an instruction, the error here, as in *Minieri*, was inconsequential since the charge "was sufficiently explanatory of the effect reputation testimony has on the prosecution's burden of proof," 303 F.2d at 555, and in light of the Government's impressive case against appellants, the

shortcoming in the charge was harmless error.

## V. *The Sufficiency of the Evidence Against Minnie Cramer*

■ Minnie Cramer contends that, however the case may be with respect to her husband, there was insufficient evidence on which to predicate a verdict of guilty against her. The record does not support this claim. Agent Sager testified that during the course of one of the conferences, Minnie admitted that she was General Manager of the office, that she wrote checks, took care of the sales invoices, purchase invoices, and assisted the bookkeeper, that she worked on the records and compiled the figures for the income tax returns, and that she gave oral information (presumably concerning the returns) to Judge Thaler. Minnie's own testimony revealed that she had regularly typed the worksheets provided to her by the bookkeeper, which were used in preparation of the Cramer's·Auto Parts Co. tax returns; that she retyped the top page of the worksheets, used in preparation of the 1962 and 1963 returns, on which the figure for the cost of purchases as reflected in the partnership records was lined out and a new figure inserted; and that she realized that the figure in regard to purchases for each of the two years was being changed. Although she denied that she recognized that the change was substantial or that she had any knowledge of its import, the jury was entitled to disbelieve this. Neither is the fact that the actual retyping of the adjusted purchase figures apparently occurred subsequent to the preparation of the returns conclusive that she was not fully aware of the changes when the returns were prepared. Both her own testimony and that of Agent Sager revealed abundant evidence of her intimate involvement with the affairs of Cramer's Auto Parts Co., its records, and, particularly the preparation of the underlying data for its tax returns, which clearly supports the jury's verdict that she knowingly participated in the making of false returns.

## VI. *Unauthorized Pyramiding of Penalties*

Louis Cramer was sentenced as follows:

Count 1 (willful evasion for 1962): suspended sentence with five years probation;

Count 2 (willful evasion for 1963): six months imprisonment;

Count 3 (willful assistance in the preparation of false returns for 1962): suspended sentence with five years probation to run concurrently with probation sentence imposed under Count 1, and a $5,000 fine;

Count 4 (willful assistance in the preparation of false returns for 1963): six months imprisonment, to run concurrently with sentence imposed under Count 2, and a $5,000 fine.

The sentences of probation are not to commence until Louis Cramer is released from confinement. Minnie Cramer received suspended sentences on all four counts with five years probation, the sentences of probation to run concurrently, and she was fined $5,000 each on Counts 3 and 4.

Appellants contend that the sentences and fines constituted an "unauthorized pyramiding of penalties." United States v. White, *supra*, 417 F.2d at 93. In *White*, the appellants were convicted on four counts of willful tax evasion for four separate years under 26 U.S.C. § 7201 and on four counts of making and subscribing a false return, 26 U.S.C. § 7206(1) for the same years. We noted that

> Section 7206(1), although it charges an offense separate and distinct in itself, is only one part in a comprehensive statutory scheme to prohibit and punish fraud occurring in the assessment and collection of taxes by the government. Section 7201 is the inclusive section, prohibiting all attempts to evade or defeat any tax *in any manner* . . . .. There follows a series of sections prohibiting specific methods of fraud in the collection and payment of taxes, all of which are separately punishable standing alone . . . .. Among these are . . . § 7206 . . . .. Thus the perjury offenses charged under § 7206 may separately form the basis for an indictment; but where proof of wilfully attempted evasion under § 7201 also proves, as an incident to the wilful evasion, the preparing and subscribing of a fraudulent return, the specific form of fraudulent conduct merges into the inclusive fraud charged under § 7201. To cumulate penalties beyond the maximum authorized by § 7201 is, therefore, improper under these circumstances . . . ..

417 F.2d at 93–94.

Assuming *arguendo* that the charges of willfully assisting in the preparation of false partnership returns, 26 U.S.C. § 7206(2) (Counts 3 and 4), are lesser offenses included within § 7201 (Counts 1 and 2), the sentences and fines imposed do not violate the principle of *White*. Since the Cramers were found guilty of two counts of willful tax evasion, 26 U.S.C. § 7201, they could have received maximum prison terms of five years and fines of $10,000 for each of Counts 1 and 2. When the sentences actually imposed under the companion counts for each year (Counts 1 and 3 relating to 1962, and Counts 2 and 4 relating to 1963) are considered together, it becomes clear that there was no cumulation beyond the maximum. Although Louis Cramer's probation sentences are not to commence until his release from confinement, this is perfectly proper since there is no bar to consecutive sentencing on convictions of independent violations of § 7201. As to Minnie Cramer, since she received four concurrent suspended sentences of five years and a total fine of $10,000, the claim of cumulation beyond the maximum permitted by § 7201 is frivolous.

Affirmed.

OAKES, Circuit Judge (dissenting):

I agree with the majority opinion except upon one point, which I believe re-

quires reversal and remand. I think the failure of the Government to have recorded the testimony of the Government witness, IRS agent Sager, given before the grand jury, is in violation of Rule 6(d), Fed.R.Crim.P., if not the due process clause of the Fifth Amendment to the United States Constitution, previous opinions of this and other Courts of Appeals notwithstanding. Rule 6(d) says a stenographer or operator of a recording device "may be present * * *" But the rule also says that "the witness under examination * * * may be present." I wonder whether the majority would construe that phrase of the rule in the same way it has construed mention of the stenographer's presence. I would agree with Professor Wright that if discretionary and selective recording is the rule, "it ought to be changed * * *. The Supreme Court has emphasized the importance to the defense of access to the transcript of the grand jury proceedings. A defendant cannot have that advantage if the proceedings go unrecorded." 1 Wright, Federal Practice and Procedure § 103 (1969 ed.).

The majority, following the language of United States v. Ayers, 426 F.2d 524, 529 (2d Cir. 1970), says that while recording grand jury testimony is the "better procedure," it is not a requirement.[1] They rely upon the footnote in Ayers, 426 F.2d at 529 n. 1, stating that "Failure to record testimony given before a Grand Jury seems still a matter about which a defendant has no right to complain." For the statement in the footnote the Ayers court relied upon Nipp v. United States, 422 F.2d 509, 512 (10th Cir. 1969), cert. denied sub nom. Bishop v. United States, 397 U.S. 1008, 90 S.Ct. 1235, 25 L.Ed.2d 420 (1970),

two pre-Dennis cases in the Second Circuit and a Columbia Law Review Note, Discovery by a Criminal Defendant of His Own Grand-Jury Testimony, 68 Colum.L.Rev. 311, 315 and n. 28 (1968). I would add to the authority of the Ayers footnote the similar rule of the Ninth Circuit, recently expressed in Reyes v. United States, 417 F.2d 916 (9th Cir. 1969), although the Ninth Circuit in reaching a result like that in the Ayers footnote also relied upon pre-Dennis cases, especially our own United States v. Cianchetti, 315 F.2d 584, 591 (2d Cir. 1963). The Tenth Circuit rule derives from Welch v. United States, 371 F.2d 287, 294 (10th Cir.), cert. denied, 385 U.S. 957, 87 S.Ct. 395, 17 L.Ed.2d 303 (1966), which didn't deal with the arguments made herein.

The Ninth Circuit in Loux v. United States, 389 F.2d 911 (9th Cir. 1968), suggests that where testimony has not been recorded, the "storehouse" of relevant information referred to in Dennis, like the snakes in Ireland, does not exist. 389 F.2d at 916. This may or may not be good Celtic history, but it is very weak logic. It might better be suggested that the prosecutor not only has exclusive access to the storehouse, but by failure to record the testimony he has thrown away the keys.

So long as we have a grand jury system, it would seem to me the recordation of witnesses' testimony is essential. It is essential in a case of this nature, where the testimony of the principal witness for the prosecution is involved, for at least two reasons. First, since Dennis v. United States, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966), a defendant has been entitled to examine the grand jury testimony of witness-

---

[1]. This court's continued admonition that recordation of grand jury proceedings is "the better procedure," United States v. Cianchetti, 315 F.2d 584, 591 (2d Cir. 1963), without requiring that the "better procedure" be followed, United States v. Ayers, 426 F.2d 524, 529 (2d Cir. 1970), begins to cast the court in the "undesirable" posture of "helpless piety" mentioned by Judge Frank in United States v. Antonelli Fireworks Co., 155 F.2d 631, 661 (2d Cir. 1946) (dissenting opinion). While the United States Attorney stated at oral argument that it is now the policy in the Northern District of New York to record all grand jury proceedings, his statement is no assurance that the next United States Attorney will not revert to the old policy.

es against him. On this point, the Court was unanimous, holding that there was "no justification" for the District of Columbia Court of Appeals' "relying upon [the] 'assumption'" that "no inconsistencies would have come to light." 384 U.S. at 874, 86 S.Ct. at 1851. The Court's decision was based on the general proposition that "[i]n our adversary system for determining guilt or innocence, it is rarely justifiable for the prosecution to have exclusive access to a storehouse of relevant fact." 384 U.S. at 873, 86 S.Ct. at 1851. In the case at bar the prosecution *did* have exclusive access to the grand jury testimony of the witness Sager, by virtue of being present, and the defense had none—to determine whether there were any inconsistencies with, say, his subsequent testimony as to damaging admissions by the defendant and by attorney Richard Thaler. The Government claims, and it is supported by the majority here, that there is no problem since defendants were given the benefit of Sager's subsequent statements including these admissions as Jencks Act materials. But assuming this to be true, it does not cure the basic infirmity that the defense could not know whether the witness testified inconsistently before the grand jury. Particularly where, as here, we are dealing with the customary federal agent who types up a report from original notes and then destroys the notes and testifies from his report, it is es-sential that a defendant be given every opportunity to determine whether, at least, the agent has been consistent with his own prior testimony.

But there is a second, perhaps more cogent reason for requiring grand jury testimony to be recorded, entirely independent of the first. The recording of testimony is in a very real sense a circumstantial guaranty of trustworthiness.[2] Without the restraint of being subject to prosecution for perjury, a restraint which is wholly meaningless or nonexistent if the testimony is unrecorded, a witness may make baseless accusations, accusations founded on hearsay or false accusations, all resulting in the indictment of a fellow citizen for a crime. In today's case it is the commercial crime of tax evasion; in tomorrow's it may be incitement to riot, conspiracy to murder, or something equally serious. It is no answer to say that the grand jury hands down only indictments, and not convictions.[3] For today, as to serious crimes, with crowded courts and crowded jails, a defendant who may subsequently be acquitted or have the charges against him dismissed, may spend a year or two or three in custody awaiting trial. See United States ex rel. Frizer v. McMann, 437 F.2d 1312 (2d Cir. 1971) (en banc). If he is fortunate enough to be a so-called "political" defendant, he may arouse sympathy and be able to advance his cause in jail or raise a large amount

---

2. We have come a long way since the time when Jefferies, C. J., could imprecate a witness to tell the truth by warning that * * * as thou will answer it to the Great God, the judge of all the earth, that thou do not dare to waver one tittle from the truth, upon any account or pretence whatsoever; * * * for that God of Heaven may justly strike thee into eternal flames and make thee drop into the bottomless lake of fire and brimstone, if thou offer to deviate the least from the truth and nothing but the truth.

Lady Lisle's Trial, 11 How.St.Tr. 325 (1685), quoted in VI Wigmore, Evidence § 1816 (3d ed.). Wigmore's point is that without a belief in Divine punishment for dissembling on the stand, an oath is meaningless. As we no longer disqualify a witness who does not believe in the supernatural, we would do well to look realistically at the much more imminent threat of recrimination which accompanies an awareness that one's testimony is being recorded verbatim.

3. "Historically, this body has been regarded as a primary security to the innocent against hasty, malicious and oppressive persecution; it serves the invaluable function in our society of standing between the accuser and the accused * * * to determine whether a charge is founded upon reason or was dictated by an intimidating power or by malice and personal ill will." Wood v. Georgia, 370 U.S. 375, 390, 82 S.Ct. 1364, 8 L.Ed. 2d 569 (1962). See 1 Wright, Federal Practice and Procedure § 101 (1969 ed.).

of bail. But if he is a typical criminal in a typical American jail, he hasn't any money, he may get only an automatic defense, he may be punished before he's even tried.

The failure to record a witness's testimony goes to the very integrity of the grand jury process. It also has consequential effects which are many and substantial.

Obviously, the practice of not requiring recordation deprives the trial court of any opportunity to exercise its discretion under Rule 6(e), Fed.R.Crim. P., to weigh a defendant's request for production of grand jury testimony against the traditional secrecy surrounding the grand jury. Dennis v. United States, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966). The practice, certainly no less than the practice of relying solely on hearsay testimony before the grand jury, "prevents the defendant from utilizing grand jury testimony in cross-examining witnesses who will testify at the trial." United States v. Arcuri, 282 F.Supp. 347, 349 (E.D.N.Y.), aff'd, 405 F.2d 691 (2d Cir. 1968), cert. denied, 395 U.S. 913, 89 S.Ct. 1760, 23 L.Ed.2d 227 (1969).[4] In fact, the practice could deny the defendant the opportunity to complain that the indictment was based solely on hearsay if the witness who testifies is as circumspect as the agent in *Arcuri, supra,* at 405 F.2d 692. It is of note that a defendant may have the grand jury testimony of a witness who testifies at trial *as of right* in this circuit, *if* that testimony were recorded. United States v. Youngblood, 379 F.2d 365 (2d Cir. 1967). The majority says that is all very well, but there is no right to have the testimony recorded. Without implying anything about the Government's good faith in this case, I am at a loss to see how the imaginary future defendant created by the majority will ever be able to prove bad faith on the part of the Government if he has no transcript of a witness's testimony from which to construct an argument that the testimony should, in good faith, have been recorded.

The benefits of having grand jury testimony recorded do not all inure to the defense. See, e. g., United States v. De-Sisto, 329 F.2d 929, 934 (2d Cir.), cert. denied, 377 U.S. 979, 84 S.Ct. 1885, 12 L.Ed.2d 747 (1964) (conviction sustained in part on basis of witness's prior sworn testimony before grand jury).

I cannot see how in some cases "the ends of justice" will override the desirability of secrecy in grand jury proceedings and compel disclosure, United States v. Socony-Vacuum Oil Co., Inc., 310 U.S. 150, 234, 60 S.Ct. 811, 84 L.Ed. 1129 (1940), while in other cases production of the testimony will be precluded by the Government attorney's decision that the case is not "serious."[5] I should not have thought that the "ends of justice" could be made to turn on whether the United States Attorney chooses to have the testimony recorded.

---

4. If, as Wigmore states, cross-examination "is beyond any doubt the greatest legal engine ever invented for the discovery of truth . . .," V Wigmore, Evidence § 1367 (3d ed.), then the recordation of testimony might be considered fuel to help make that engine run. Indeed, in the English magistrate's and coroner's inquests, recordation has been required at least since the 1550's, 1 & 2 Phil. & M., c. 13, § 4 (1554); 2 & 3 Phil. & M., c. 10 (1555), quoted in IV Wigmore, Evidence § 1326, n. 1 (3d ed.), with the incidental result that recorded testimony taken at a coroner's inquest was, until 1848, when Sir John Jervis' Act, 11 & 12 Vict. c. 42 (1848) required cross-examination, admissible despite the hearsay rule.

5. The appellants, who received sentences of 6 months' imprisonment, 5 years' probation, $10,000 fine, and 5 years' probation, $10,000 fine, respectively, would take issue with the Government's assertion that this is not a "major criminal case."